(635 P.2d 1248)

No. 52,158

JOHN CARSON, *Plaintiff-Appellant,* v. CHEVRON CHEMICAL COMPANY and WAITS HOMEGAS, INC., *Defendants-Appellees,* and WAITS HOMEGAS, INC., *Cross-Claimant/Appellant,* v. DONALD W. JOHNSON, *Plaintiff-Appellee,* and COLLINGWOOD GRAIN, INC., *Intervenor-Appellee.*

Opinion filed October 29, 1981.

*Alexander B. Mitchell,* of Sargent, Klenda, Haag & Mitchell, of Wichita, for the appellant John Carson and the appellee Donald W. Johnson.

*Donald H. Humphreys,* of Great Bend, for the cross-claimant/appellant Waits Homegas, Inc.

*Robert L. Baer,* of Cosgrove, Webb & Oman, of Topeka, for the appellee Chevron Chemical Company.

*Christopher Randall* and *Eldon L. Boisseau,* of Turner & Boisseau, Chartered, of Wichita, for the appellee Waits Homegas, Inc.

*Michael R. O'Neal* and *H. Newlin Reynolds,* of Hodge, Reynolds, Smith, Peirce & Forker, of Hutchinson, for the appellee Collingwood Grain, Inc.

Before ABBOTT, P.J., PARKS and SWINEHART, JJ.

SWINEHART, J.: This appeal is actually two separate appeals stemming from what was originally one lawsuit. In 1977 Donald W. Johnson, John Carson, and Aubrey Price filed suit against Chevron Chemical Company and Waits Homegas, Inc., alleging breach of express and implied warranties arising out of the failure of a contact herbicide, Paraquat, to kill existing weeds and grasses, the consequence of which was the failure of the plaintiffs' 1976 no-till milo crops. By agreement of the parties and by order of the district court, the three plaintiffs' claims were tried separately. Plaintiff Carson appeals from the directed verdicts which ended his trial. Defendant Waits Homegas appeals from post-judgment orders concerning the proceeds from the judgments in the Johnson trial.

We will first consider plaintiff Carson's appeal from the order of the District Court of Kiowa County which directed verdicts on all counts against him in favor of defendants Chevron Chemical Company and Waits Homegas, Inc.

Carson raises the following issues on appeal: (1) whether the trial court erred in holding that Carson was barred from any remedy against Chevron for failing to give notice of the alleged breach of express and implied warranties as is required by K.S.A. 84-2-607 (3)(*a*); (2) whether the trial court erred in directing a verdict for Chevron on the issues of express warranty and implied warranty of fitness for a particular purpose; (3) whether the trial court erred in directing a verdict for Waits on the issues of express warranty and implied warranty of fitness for a particular purpose; (4) whether the trial court erred in refusing to admit into evidence the defendants' answers to certain interrogatories.

The facts in this case are necessarily detailed. According to the evidence presented by plaintiff Carson, Carson was a farmer in south central Kansas and had been engaged in farming most of his life. Chevron Chemical Company promoted and distributed a wide array of agricultural chemicals, including a contact herbicide known as Paraquat. Waits Homegas, Inc., was a retailer of agricultural chemicals, including Paraquat, and a custom applicator of such chemicals.

In 1973 Carson began managing Kinsley Farms, a 6,300 acre Edwards County farm using center-pivot irrigation. Carson had been utilizing the center-pivot irrigation method of farming since 1964. All of his experience since 1962 had been in sandy soils.

In 1975 Chuck Bolder, the area sales representative for Chevron, learned that Carson was interested in the concept of no-till farming. Bolder decided to meet with Carson and introduce him to Chevron's product, Paraquat, and to Chevron's program of no-till farming. Bolder met with Carson at Kinsley Farms, viewed some of the property, and noticed that the bulk of the property was sandy ground. Carson expressed a desire to adopt a farming practice which would stop the sand from blowing. Bolder knew at the time that one of the principal problems in that area was blowing sand. Bolder told Carson about the suitability of no-till farming with Paraquat on sandy soil. Bolder also told Carson that by substituting a contact herbicide, such as Chevron's Paraquat, for conventional plowing and tillage in the preparation of a seed bed, he would receive benefits such as moisture conservation, prevention of wind and water erosion, reduction in fuel expenses, reduction in machinery, and a considerable reduction in time and effort.

After hearing Bolder's sales pitch, Carson was interested in this no-till concept and decided that he would like to see a test plot of no-till corn using Paraquat. Bolder and Carson together selected one of the 130 acre irrigated circles that was fairly representative of the soils on the farm. Bolder arranged for a no-till planter while Carson contacted Mike Richard and Chuck Moss of Waits Homegas, Inc., to apply the herbicides. The test plot of 130 acres was planted with no-till corn in 1975 by Carson, and Waits Homegas sprayed the plot with Paraquat, along with the required residual herbicides. Both Carson and Richard of Waits Homegas monitored the crop's progress and observed a total kill of all existing weeds and grasses, and a good stand of corn with no tillage or cultivation of the soil.

Carson discussed the results with Richard, and Richard assured him that no-till was the way to farm in that type of sandy ground. Carson asked Richard about the suitability of no-till with other crops, including milo, to which Richard replied that he saw no reason why milo could not be planted no-till.

Immediately after the 1975 harvest of the no-till corn crop, Bolder approached Carson with the proposition of having Carson be a telephone consultant for Chevron, which would include telling people about his successful 1975 no-till corn crop, attending various growers' meetings, and attending a Chevron school in Iowa to learn more about no-till farming with Paraquat. Carson agreed to this proposition and told Bolder that he wanted to know more about no-till and Paraquat, and that he would gladly attend the Chevron school in Des Moines, Iowa. While at the Chevron school, Carson was given two of Chevron's pamphlets entitled "Getting Started with No-Till" and "There's Got to Be A Better Way."

A portion of "Getting Started with No-Till" contained the following statements:

"YOU'VE PROBABLY HEARD all the advantages before - that no-till can and does save fuel, save soil, save labor, save water, save machinery costs, let you farm most land - even hilly land - and much more. Chances are, one or two of the above benefits are most important to you.

"But you have to approach things somewhat differently to succeed with no-tillage. When farming with one trip across a field, you don't get the opportunity to 'bury' your mistakes like you do with a moldboard plow, or even a chisel plow or disc.

"You have to rely completely on herbicides for weed control in most instances.
. . . .

"No-till is ideally suited to the young farmer just getting started or any farmer needing to replace a major share of his farm machinery. With no-till, you can trim your machinery investment by around 40%. You simply do not need as much equipment to farm the no-till way.

"Instead of a barn full of equipment, all you need is a medium size tractor, planter, sprayer and combine - and you're in business. You can forget about the moldboard plow, huge horsepower tractor, disc, drag, chisel plow, cultivator, and other equipment.

. . . .

"No-tillage is working on most types of soil found throughout the country.

"However, it does work best on soils with good drainage, even though a few farmers turn out good yields from fields suffering from drainage problems. As a rule of thumb, if the soil you select is productive with tillage, it will be productive without tillage.

" 'No-tillage, when properly performed, has the highest yield potential of any tillage choice on some soils. No-tillage planting is also possible whenever the soil is dry enough to plow, a significant factor in years with wet springs.'

"Moderately well to excessively well drained, these silt loam, loam, sandy loam or fine loamy sand surface textured soils are relatively low in organic matter. They include glaciated, residual and terraced soils.

. . . .

"When you switch to *no-tillage farming,* you switch to an often total reliance on chemicals for control of unwanted vegetation. This reliance makes it very important to know your chemicals and what they can do for you.

. . . .

"PROPER SPRAYING will have as much to do with making a success of no-tillage crop production as anything you do.

"With no chance to bury your mistakes with a plow or cultivate problem weeds, you have to make sure spraying is done correctly.

"This means usage of the correct nozzles, right boom heights, right sprayer speed, right amount of water or liquid nitrogen carrier, proper mixing of chemicals and much more.

"Many farmers solve the problem of proper chemical application by relying on custom applicators. They have experience with various chemicals and the know-how to insure that the job is done the right way.

. . . .

"Remember - spraying of chemicals is a critical part of no-tillage. This has to be done right if you are to be successful with no-tillage. This is an area where it pays to take your time and do things right."

In the brochure captioned "There's Got to Be A Better Way" there appears the following statement:

"These men have found that no-tilled fields will produce yields at least equal to plowed ground, and some count on better yields from their no-tilled land in a dry year."

Carson read and studied these brochures. These statements quoted above were read to the jury.

At the Chevron school in Des Moines, Carson specifically told Chevron's representatives about his sandy land farming, and specifically questioned them as to whether no-till milo, particularly milo double cropped behind wheat, would work in his sandy soil. He was assured by the Chevron representatives that it would work.

Upon his return from Des Moines, Carson again questioned Mike Richard of Waits Homegas as to whether no-till milo would work. He was told by Richard that the no-till milo would work just as well as the no-till corn.

In the fall of 1975, Carson personally leased three quarter sections of dry land, developed them with center-pivot irrigation and devoted them to no-till milo for 1976. His principal reason for choosing to no-till farm this additional acreage was that since he would be fully occupied with his duties in managing the 6,300 acre Kinsley Farms, he would have insufficient time to devote to conventionally farming these three quarter sections. Since Chevron had represented that no-till farming with Paraquat would work in the sandy soil and that there would be a considerable reduction in time consumed by employing this new farming method, Carson believed that he could produce extra income from these three quarter sections by growing no-till milo.

At a February 1976 growers' meeting arranged by Waits Homegas, Bolder of Chevron told the farmers in attendance, which included Carson, about Paraquat and the use of no-till farming. The purpose of the meeting was to give Bolder an opportunity to sell the concept of no-till farming with Paraquat. Bolder assured the farmers that no-till with Paraquat would work.

Prior to the planting season in 1976, Carson spoke with Chuck Moss and Mike Richard of Waits Homegas and told them that he would be short of time during the coming growing season; that he wanted Waits to design and implement a fertilizer and herbicide program for his no-till milo; that he wanted yields of 140 to 150 bushels per acre for full-season milo and 110 to 120 bushels per acre for short-season milo behind the wheat; and that Waits was to design the fertilizer program to achieve those yields, apply the chemicals and fertilizers and keep the fertilizer tanks full. Waits agreed to provide such a service and to supply the necessary chemicals.

The no-till planting and spraying of Carson's new acreage was accomplished in June of 1976. About three days later Carson complained about the inadequate results to an employee of Waits. The fields were resprayed with Paraquat and still no total positive results were obtained. The crops were then replanted and still no total kill resulted. Carson eventually complained to Jess Waits, owner of Waits Homegas, about the problems Carson had experienced with Paraquat during the summer of 1976.

Throughout this entire period Carson, as a Chevron telephone consultant, made statements to farmers endorsing the use of Paraquat for no-till milo. Sometime in August of 1976, Carson was interviewed about no-till farming with Paraquat for "Irrigation Age," an agricultural magazine. An article appeared in the magazine in which Carson lavishly praised the performance of no-till milo.

In September of 1976 Carson consented to have some favorable statements he made about Paraquat and no-till farming appear in Chevron's advertising.

On three or four occasions after July of 1976, Carson communicated with Bolder of Chevron, mostly face-to-face at the Kinsley Farms. At no time did Carson complain to Bolder about Paraquat failure. Since no one from Waits informed them, Chevron's first notice of Carson's problems with Paraquat was when this lawsuit was filed in May of 1977.

In the spring of 1977, Waits called Carson to discuss his herbicide bill. Carson refused to pay the entire bill because of the ineffectiveness of the herbicides. He offered to pay $10,000 of the $35,959.16 bill. The record shows a credit on February 28, 1977, of $9,976.

In April of 1977, Carson authorized his secretary to correct and return to Chevron's advertising agency a Paraquat endorsement which resulted in a Chevron advertisement brochure. In May of 1977, Carson filed this lawsuit.

At the end of Carson's evidence, both defendants, Waits and Chevron, moved for directed verdicts. The trial court granted all the motions. As to Chevron, the trial court held that no express warranty existed which was the "basis of the bargain" as required by K.S.A. 84-2-313. It also held that no implied warranty of fitness for a particular purpose existed since the chemicals were used for their normal purposes. In the journal entry the trial court

cited to lack of reliance on Chevron by Carson as the reason for its holding on the implied warranty issue. The trial court went on to hold that it did not have to resolve the warranty issues as to Chevron since no notice of breach of warranty was given to Chevron by Carson as is required by K.S.A. 84-2-607 (3)(*a*). Without such notice, Carson is barred from any remedy.

As to Waits, the trial court held that no implied warranty of fitness for a particular purpose was made since the chemicals were used for their normal purposes. In the journal entry the trial court cited to the lack of reliance as the reason for this holding. The court also found no express warranty to exist because any affirmations made by Waits were not the "basis of the bargain" and because Carson had equal or superior knowledge concerning the chemicals. The trial court found that Carson had acted on his own and was not induced by anything Waits may have said. The trial court did not deal with the notice question with Waits. The trial court did, however, direct a verdict in favor of Waits' counterclaim against Carson for the amount due on open account.

Carson first contends that the trial court erred in holding that he was barred from any remedy against Chevron for failing to give Chevron notice of the alleged breach of express and implied warranties as required by K.S.A. 84-2-607 (3)(*a*).

K.S.A. 84-2-607 (3)(*a*) states:

"(3) Where a tender has been accepted

"(*a*) the buyer must within a reasonable time after he discovers or should have discovered any breach notify *the seller* of breach or be barred from any remedy . . . ." (Emphasis added.)

The issue presented is whether Carson is required to have given Chevron notice of breach in order to seek redress from Chevron. Technically, Waits is Carson's seller of the Paraquat and Chevron is the manufacturer. The cases and authorities are split on the question of whether UCC 2-607 (3)(*a*) requires the buyer to notify just his immediate seller, or whether it also requires him to notify the manufacturer in order to bring suit against the manufacturer for breach of warranties. The issue is one of first impression in Kansas.

Carson contends the trial court erred in holding that notice should have been given Chevron. He contends that notice to his immediate seller, Waits, is sufficient. Carson supports his position by citing to Official UCC Comment 4 which states in part:

"[T]he rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." This comment is in the context of the reasonableness of the time in which notice is to be given and does not resolve the issue presented. The comment does, however, indicate that the drafters of the UCC were primarily concerned with good faith.

Carson also cites to two cases which support his position: *Tomczuk v. Cheshire,* 26 Conn. Supp. 219, 217 A.2d 71 (1965), and *Vintage Homes, Inc. v. Coldiron,* 585 S.W.2d 886 (Tex. Civ. App. 1979). The court in *Tomczuk* stated that a manufacturer was a seller only as to the retailer and not as to the purchasers from the retailers. The court in *Vintage Homes* held that the notice requirement of UCC 2-607 applies only as between a buyer and his immediate seller. 585 S.W.2d at 888. The Texas court cites to 2 Anderson, Uniform Commercial Code § 2-607:14, p. 211 (1971), for authority: "A person not in privity with the defendant [manufacturer], assuming that he is permitted to sue the defendant, is not barred for having failed to give notice to the defendant for the Code only requires that the plaintiff give the notice to 'his seller.'" Anderson cites to *Tomczuk* as support for this point.

According to the court in *Prutch v. Ford Motor Co.,* _____ Colo. _____, 618 P.2d 657, 661 (1980), the UCC 2-607 notice requirement serves three useful purposes:

"First, notice provides the seller a chance to correct any defect. [Citations omitted.] Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them. [Citations omitted.]"

Chevron contends that the purposes of the notice requirement have been defeated since it was not afforded an opportunity to observe the alleged failure and to attempt to remedy the problem. Chevron also maintains that the delay in notice hampered its ability to prepare for litigation because of the lost opportunity to investigate the situation on a first-hand basis.

The primary argument for requiring notice of breach to the remote manufacturer is closely connected with the UCC abandonment of privity requirements. K.S.A. 1980 Supp. 84-2-318 and K.S.A. 50-639(*b*) have effectively eroded the doctrine of privity in consumer transactions. Chevron contends that if a buyer can bring an action against a seller, notwithstanding a lack of privity,

it would seem equally logical that a seller may defend on the basis of lack of notice, notwithstanding the lack of privity. The counter argument to this position, which is urged for adoption by Carson, is that in many instances a buyer would not know whether a particular defect or nonconformity could be remedied by the immediate seller, or whether it was the manufacturer's responsibility. The immediate seller would be in the better position to make that determination. If the manufacturer would be best able to correct the defect or problem, the immediate seller could then pass the notice of breach upstream to the manufacturer. If the immediate seller could promptly repair or correct the defect, then they could do so without the further delay caused by securing notification to the manufacturer. Carson's argument makes good sense, when in the context of the relatively unsophisticated consumer and the remote, inaccessible manufacturer.

Under the facts of this case, Carson was actually more of a buyer from Chevron than from Waits. A fair analysis would be that Chevron was Carson's seller and Waits was primarily the applicator. The manufacturer, Chevron, and the dealer, Waits, worked hand-in-hand to sell Carson on no-till farming using Paraquat. Carson was in regular contact with Chevron, even employed as a consultant by them. In no stretch of the imagination can Chevron be characterized as a "remote" manufacturer. It would be equally incorrect to characterize Carson as an "unsophisticated consumer." The policy arguments stated above are tempered when viewed in this context.

It is the finding of this court that in the ordinary buyer-seller relationship, K.S.A. 84-2-607 (3)(*a*) requires that notice of an alleged breach need be made only to the buyer's immediate seller. In those instances, however, where the buyer and the other parties to the manufacture, distribution and sale of the product are closely related, or where the other parties actively participate in the consummation of the actual sale of the product, the reasons for the exclusion of such other parties from the K.S.A. 84-2-607 (3)(*a*) notice provision cease to exist. We therefore recognize an exception to the general rule stated above. To require less of the buyer in his dealings with such other parties under the given circumstances than that which is required of the buyer in his dealings with the immediate seller would be an injustice, and would be contrary to the intent and purpose of K.S.A. 84-2-607

(3)(*a*). We find that the facts presented in this case are such that notice to Chevron was required to enable Carson to seek any remedy against Chevron.

Having determined that notice in accordance with K.S.A. 84-2-607 (3)(*a*) upon Chevron was essential, the other issues on appeal as to Chevron are moot, since such notice was not given.

We now consider Carson's allegations of error concerning his case against Waits. The trial court held that no express warranty from defendant Waits existed because any affirmations made by Waits were not the "basis of the bargain" and because Carson had equal or superior knowledge concerning the chemicals. The following request for admission, which was propounded to and admitted by defendant Waits, was read to the jury:

"[Request] That you made certain statements of fact to Mr. Carson, namely that Paraquat killed existing vegetation on contact and when combined with a residual herbicide would permit a no-till milo crop on his three subject circles.

"[Response] Admitted."

Notwithstanding this admission, the evidence shows that Waits was basically inexperienced with Paraquat. In fact, Waits had only applied it on one occasion, that being on the one circle farmed by Carson as a test plot in 1975. This factor, together with the fact that Carson had become extremely knowledgeable about Paraquat, supports the trial court's conclusions that the affirmations made by Waits did not rise to the level of being considered the basis of the bargain. As was stated before, Waits can more accurately be characterized as an applicator rather than as a seller. Carson's primary purchase from Waits was its service rather than its herbicides. The affirmations made by Chevron were clearly more influential to Carson than the affirmations made by Waits. We therefore hold that the trial court did not err in directing a verdict in favor of defendant Waits on the issue of express warranty.

K.S.A. 84-2-315 reads as follows:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

The trial court stated two reasons for directing a verdict in favor of defendant Waits on the issue of implied warranty of fitness for

a particular purpose. The first reason offered was that the chemicals were used for their normal purposes, not for any particular purpose, therefore making K.S.A. 84-2-315 inapplicable. The second reason advanced by the court was that no evidence of reliance by Carson on Waits' skill or judgment was presented.

Official UCC Comment 2 to 2-315 is helpful in analyzing the trial court's first point:

"2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question."

Paraquat was sold and applied by Waits to be used in conjunction with the no-till method of farming that Chevron was advocating. This use was the ordinary, expected use of the herbicide.

The evidence reveals that Carson did not seek a recommendation from Waits for which herbicide he should use in his particular situation. Instead, the evidence clearly shows that Carson used Waits to handle his herbicide and fertilizer program, given the fact that he was going to farm using the no-till method with Paraquat as the contact herbicide.

The following paragraph of Carson's testimony indicates that Carson was relying on Waits for its service and not its judgment.

"I said, 'Now, look, I'm going to be short of time. I would like to turn that whole fertilization program and herbicide program over to you fellows. I'd like for you to sell me a complete package program where you keep the fertilizer to my pumps. I don't want to have to call you. I want you to keep those fertilizer pumps full. I want you to run the soil tests and make whatever kind of analysis you feel like is necessary.'

. . . . .

"And I said, 'Design my fertilizer program, whatever it takes, to fit that program.' And in fact I said, 'You're my man. I'm going to trust my herbicide and fertilizer programs to you.' "

Since Carson was apparently much more knowledgeable about Paraquat, especially after spending one week at a Chevron training school, it would be unlikely for Carson to have relied on Waits for special information concerning Paraquat.

We find that the trial court did not err in directing a verdict in favor of defendant Waits on the issue of implied warranty of fitness for a particular purpose. The evidence clearly supports its finding that the chemical involved was used for its ordinary

purpose, therefore making K.S.A. 84-2-315 inapplicable. We also find, contrary to statements which were made by the trial court, that reliance is not an essential element of implied warranty under the UCC. "The judgment of a trial court, if correct, is to be upheld, even though the trial court may have relied upon a wrong ground or assigned an erroneous reason for its decision." *Farmers State Bank v. Cooper,* 227 Kan. 547, Syl. ¶ 10, 608 P.2d 929 (1980).

Carson's final contention is that the trial court erred when it refused to admit into evidence the defendants' answers to interrogatories numbered 4, 5, 6, and 9. A review of the record indicates that the trial court did not err. The proposed evidence had little, if any, relevant, useful, evidentiary value. We therefore hold that the trial court did not abuse its discretion by excluding the evidence.

Judgment is affirmed as to plaintiff Carson.

We will now consider the second part of this appeal, the case of plaintiff Donald Johnson against defendants Waits Homegas, Inc., and Chevron Chemical Company, district court case No. 77-C-4. Also involved in this portion of the appeal is an intervenor, Collingwood Grain Company.

As was earlier noted, in the summer of 1976 three farmers (Carson, Johnson and a third party who did not appeal) chose to try a new no-till method of farming utilizing Paraquat as a contact herbicide. In Johnson's case, defendant Waits brought a counterclaim against Johnson on the amount overdue on an open account. The unpaid bill was for the herbicides and application services Waits provided to Johnson in connection with the failed no-till crops which are the basis of this lawsuit. Subsequent to the answer and counterclaim being filed by Waits, on June 23, 1977, Waits filed a separate action, numbered 77-C-11, against Johnson in the District Court of Kiowa County to recover the remaining amounts due Waits from Johnson on open account for fertilizer and gas, exclusive of the amount prayed for in the counterclaim in No. 77-C-4.

The next important date in this lawsuit is July 10, 1978. On that date Johnson assigned to Collingwood Grain Company the right to receive up to $50,000 of the proceeds, after attorney fees, which might be awarded from Johnson's district court case No. 77-C-4. This assignment served as collateral to secure a debt due Col-

lingwood from Johnson in the amount of $41,858.82. As of July 10, 1978, case No. 77-C-4 had not been tried, nor a judgment entered therein.

On January 25, 1979, judgment was entered in favor of Waits against Johnson in the amount of $18,149.22 in case No. 77-C-11. This judgment was reached by agreement of the parties. On March 14, 1980, a jury verdict was entered in case No. 77-C-4. On that same date Johnson's attorney filed an attorney's lien in case No. 77-C-4. On April 24, 1980, the journal entry was filed in case No. 77-C-4 and the judgment was as follows:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THE COURT, that the Plaintiff [Johnson] shall have judgment against the Defendant, Chevron Chemical Company, in the amount of $28,350.00, and against the Defendant Waits Homegas, Inc., in the amount of $5,000.00.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT, that the Defendant, Waits Homegas, Inc., shall have judgment on its counterclaim in the amount of $3,336.00."

In March of 1980, after the jury verdict and before the journal entry was filed, Waits garnished Chevron, based upon Waits' judgment in case No. 77-C-11, claiming any money due Johnson by Chevron from the judgment entered in case No. 77-C-4. In May of 1980, Waits again garnished Chevron, but this time it was based upon Waits' judgment against Johnson in case No. 77-C-4.

On May 19, 1980, Collingwood Grain filed a motion to intervene in both No. 77-C-4 and 77-C-11, asserting its priority over Waits' garnishments by virtue of Collingwood's prior assignment from Johnson dated July 10, 1978. Collingwood's motion to intervene was granted on June 4, 1980. As a result of this proceeding, on July 7, 1980, the trial court conducted a hearing to determine priorities in the judgment proceeds. The court found: (1) that the assignment between Collingwood and Johnson was valid and prior to any liens claimed through garnishments of Waits; (2) that Waits' judgment in case No. 77-C-4 was not subject to being set off against Johnson's judgment versus Waits in the same case, and that when Waits paid the judgment due to Johnson, the proceeds should go to Collingwood pursuant to its assignment; and (3) that Johnson's attorney's lien had priority over Waits' garnishments. Waits appeals the trial court's judgment on the grounds: (1) the trial court erred in finding the assignment between Johnson and Collingwood to be valid; (2) the trial court erred in finding that the assignment between

Johnson and Collingwood had priority over Waits' garnishments and claims; (3) the trial court erred in finding that no right of setoff existed for Waits in regard to its judgment in case No. 77-C-4 as against the judgment in favor of Johnson versus Waits in the same case; and (4) the trial court erred in finding that the March 1980 attorney's lien had priority over Waits' garnishments and claims in both instances.

Waits contends that the assignment from Johnson to Collingwood of the possible proceeds due from a judgment in case No. 77-C-4 is invalid for several reasons. The first reason advanced by Waits is a lack of consideration. The trial court found that the consideration which supports this assignment is the forbearance by Collingwood, for over one year, to take legal action on the past-due debt owed by Johnson to Collingwood. No evidence was presented which contradicts the fact that Johnson owed Collingwood a sum of money which was due at the time the assignment was made. It has long been held that "[i]f a judgment is assigned as security for a *bona fide* antecedent indebtedness the consideration for such assignment is sufficient." *Alexander v. Clarkson,* 100 Kan. 294, Syl. ¶ 4, 164 Pac. 294 (1917).

Waits also contends that the assignment is invalid because it violates the statute of frauds, K.S.A. 33-102, since it was made with the intent of defrauding creditors. K.S.A. 33-102 provides:

"Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect."

The alleged fraud is that the assignment was made to Collingwood at a time when Johnson knew that Waits was claiming Johnson owed the amount sued for in case No. 77-C-11. The assignment was, however, made prior to the judgment in No. 77-C-11. In *Bank of Inman v. Graves,* 148 Kan. 468, 83 P.2d 666 (1938), the Supreme Court stated the general rule concerning fraudulent conveyances:

"In an action to set aside a deed as in fraud of creditors of the grantor, the question whether there was a bona fide debt from the grantor to the grantee, the payment of which constituted a sufficient consideration, whether the value of the lands conveyed was substantially in excess of the debt and whether there was intent to defraud, were largely questions of fact, and the findings of the trial court thereon, being supported by evidence, are conclusive on appeal." (Syl.)

At the hearing the trial court concluded: "I find nothing in the record to indicate any attempt to defraud anyone." On appeal the role of this court is to determine whether or not the trial court's finding is supported by competent evidence. Counsel for Waits makes this chore rather simple, since he admitted at the hearing: "Concerning the statute of frauds we haven't offered any factual evidence."

Waits next contends that the assignment is invalid because it is in violation of the statute of frauds, K.S.A. 33-106. Waits argues that since the assignment is an agreement not to be performed within one year, the consideration term should be in writing. Waits' argument fails on two grounds. First, the agreement could potentially have been performed within one year, since the parties to case No. 77-C-4 could have settled the suit within the one-year period; this possibility takes the agreement outside the statute of frauds' writing requirement. Second, the assignment is evidenced by a writing. There is no requirement that the consideration term be in writing. In fact, K.S.A. 16-107 provides that "[a]ll contracts in writing, signed by the party bound thereby, or his authorized agent or attorney, shall import a consideration." Waits also maintains that the assignment is not signed by the party to be charged. The record clearly shows that Johnson, the party to be charged, has signed the agreement.

We hold the trial court was correct in finding that the assignment between Johnson and Collingwood was valid. Waits' contentions to the contrary are without merit.

Waits contends that its garnishment orders should have priority over Collingwood's assignment of the proceeds due Johnson from the judgment in case No. 77-C-4. The record reveals that Waits obtained two garnishment orders: one in March of 1980 on Chevron in case No. 77-C-11, claiming money owing Johnson by Chevron due to case No. 77-C-4; and one in May of 1980 on Chevron in case No. 77-C-4. Collingwood's assignment was dated July 10, 1978. The trial court held that Collingwood's assignment had priority over Waits' garnishments.

In *Hall v. Terra Cotta Co.,* 97 Kan. 103, 154 Pac. 210 (1916), the Kansas Supreme Court was confronted with a similar problem, but in a different context. In *Hall* a defendant corporation assigned to a bank the proceeds of a contract to become due for

furnishing materials and labor to a building contractor. The court held that the assignment was valid as against a garnishment of the funds in the hands of the building contractor. The court stated:

"When the borrower thus assigns his contract or the possible profits of his contract in good faith, such assignment should be respected. Nor can a later garnishing creditor justly complain. The garnishment process only reaches the property, assets and credits of the debtor, and not that of which the debtor was formerly the owner nor that which he has lawfully assigned to a third party." 97 Kan. at 106.

The mere fact that Waits' first garnishment stems from the January 25, 1979, judgment in case No. 77-C-11 does not give Waits priority since the assignment was executed prior to the judgment in case No. 77-C-11, and since a judgment does not act as a lien on personal property unless and until levy is made. *In re Wilson*, 390 F. Supp. 1121 (D. Kan. 1975). Waits' first attempt to levy on the judgment proceeds in case No. 77-C-4 was not made until March of 1980. Since the Collingwood assignment preceded this garnishment attempt by almost two years, we find that the trial court correctly held that Collingwood had priority over the proceeds from the judgment debtor, Chevron.

The judgment which was entered in case No. 77-C-4 consisted of both a judgment for Johnson against Waits for $5,000 and a judgment for Waits on its counterclaim against Johnson for $3,336. Waits contends that these judgments should be offset from one another, leaving a judgment against Waits for only $1,664. The trial court disagreed, ordering that upon payment by Waits of the $5,000 judgment to the clerk of the court, the money should be paid over to Collingwood pursuant to its assignment of the judgment proceeds. Waits contends that the trial court is in error on this point. Waits cites to 6 Am. Jur. 2d, Assignments § 102, pp. 282-283, for support:

"[T]he general rule is that an assignee of a non-negotiable chose in action acquires no greater right than was possessed by his assignor, and simply stands in the shoes of the latter.

"In an action on the claim assigned, the assignee is ordinarily subject to any setoff or counterclaim available to the obligor against the assignor and to all other defenses and equities which could have been asserted against the chose in the hands of the assignor at the time of the assignment."

This general rule makes good sense. The present case, however, has one distinguishing feature: the entire chose in action was not assigned, merely the proceeds (up to $50,000) from any judgment

resulting from the action had been assigned. A variation from the general rule would therefore be appropriate.

The trial court did not maintain that the possibility of a setoff did not exist. Instead, it referred to *Taylor v. Taylor,* 180 Kan. 213, 303 P.2d 133 (1956), as the reason for its holding. The court in *Taylor* held:

"It may be conceded that the mere fact that mutual judgments exist does not as a matter of right entitle a party to have one set off against that of the other. It has often been held, however, that a setoff as between judgments is within the discretion of the court to which the application is made, that the court shall take into consideration the equities between the parties or those claiming under them with notice thereof, and that if the court to which the application is made allows the setoff, it will only be disturbed in a case such as is under consideration here where it appears that the setoff has operated to the prejudice of a third party without notice of the equities when an assignment has been made to him and he complains." 180 Kan. at 218.

The court in *Taylor* cited to *Schuler v. Collins,* 63 Kan. 372, 65 Pac. 662 (1901), as authority for its position. The court in *Schuler* held:

"The mere existence of mutual judgments, though rendered in the same court and about the same time, does not entitle a party to an order or judgment of setting one of them off against the other upon demand.

"Whether the power to set off judgments shall be exercised is to be determined in every case upon equitable considerations, and it will never be done where it will operate as an injustice or infringe upon the substantial rights of others." Syl. ¶¶ 1, 2.

It is apparent from the record that the trial court was cognizant of the rule in *Taylor* and was exercising its discretion in ordering that there be no setoff. Waits has not presented any evidence to indicate that the trial court abused its discretion in this regard. We therefore hold that the trial court did not err in refusing to offset the two judgments.

The final issue to be decided is whether or not the attorney's lien in this case should have had priority over Waits' garnishments and claims.

K.S.A. 7-108 reads in part:

"An attorney has a lien for a general balance of compensation upon any papers of his or her client which have come into the attorney's possession in the course of his or her professional employment, upon money in the attorney's hands belonging to the client, and upon money due to the client and in the hands of the adverse party, in any matter, action or proceeding in which the attorney was employed, from the time of giving notice of the lien to the party . . . ."

Johnson's attorney filed his attorney's lien on March 14, 1980, the same day that the jury verdict was returned in case No. 77-C-4. The journal entry reflecting this verdict was filed on April 24, 1980. On March 24, 1980, Waits' first garnishment order was served on Chevron.

Waits contends that the attorney's lien should be subject to Waits' prior claim on Johnson from the judgment in case No. 77-C-11 since the judgments in No. 77-C-11 and 77-C-4 are "coexistent." Waits contends that the claims are coexistent since they were only brought as separate actions for "procedural convenience."

The trial court gave this argument little merit. We concur. K.S.A. 7-108 is unambiguous: Johnson's attorney has an attorney's lien from the point in time such lien was filed and notice was given. The garnishment actions by Waits were subsequent to the filing and service of the notice of the attorney's lien. We therefore hold that the trial court did not err in finding the attorney's lien to have priority.

Judgment affirmed.