THE FIRESTONE TIRE AND RUBBER COMPANY *v.*
JAMES H. CANNON T/A CANNON TRUCKING ET AL.

[No. 1028, September Term, 1982.]

*Decided November 9, 1982.*

---

The cause was argued before LOWE, WILNER and WEANT, JJ.

*Deborah E. Jennings,* with whom was *Edward S. Digges, Jr.,* on the brief, for appellant.

*William H. Adkins, III,* with whom were *Henry, Hairston & Price* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court. LOWE, J., files a concurring opinion at page 119 *infra.*

The narrow question presented in this appeal is whether a buyer of goods may sue a person other than his immediate seller for breach of implied warranty without having given that person timely notice of the alleged defect. Restated: Does Md. Code Ann., Comm. Law art. § 2-607 (3) (a) require a buyer to give notice of a claimed breach of implied warranty to a "remote" seller — someone in the marketing chain other than the person from whom he bought the goods? The question has not previously been decided in Maryland.

The facts of the case are not in dispute. On September 21, 1978, appellee, a trucker, purchased a tire for one of his tractors from Elliott Equipment Company. Elliott had obtained the tire from Swann Tire Center, a wholesaler, which had, in turn, purchased it from Commercial Tire Co. Commercial obtained the tire from Seiberling Tire Co., a subsidiary of appellant Firestone Tire and Rubber Company.[1] The tire was manufactured by Firestone, but it had Seiberling's name on it. It was mounted on appellant's tractor by Swann's employees at Elliott's facility.

---

\* Note: *Certiorari* granted, Court of Appeals of Maryland, March 8, 1983.

1. The agreed statement of facts filed by the parties omits to mention the role of Commercial Tire and Seiberling in the distribution chain. We were apprised of their existence at oral argument.

On September 28, 1978, while the tractor was hauling a trailer in Arizona, the tire in question "blew out," causing the tractor to cross a median strip and strike two trees. As a result of that occurrence, appellee suffered extensive damage to his tractor; he also lost some $8,100 in profits from his inability to use the tractor during the fourteen-week period it was undergoing repairs.

Within a few days after the accident, appellee notified Elliott of the occurrence. No such notice was given to Swann, Commercial, Seiberling, or to Firestone, however, until this suit was filed against them in January, 1980.[2] Evidence elicited by Firestone permits a fair inference that Firestone was prejudiced by the lack of earlier notice in that (1) certain evidence that may have been relevant in establishing the cause of the "blow-out" was lost during the interim;[3] (2) actions *could* have been taken by Firestone shortly after the accident to mitigate appellee's economic losses;[4] and (3) earlier notice may have prompted or enhanced an amicable settlement of the controversy.

The case proceeded to trial against Firestone[5] on the theories of negligence, strict liability, and breach of implied warranties of merchantability and fitness for a particular purpose. As the result of certain rulings below, which the parties do not dispute here, appellee's claim for lost profits was submitted to the jury only under the breach of warranty counts, the court having declared such lost profits to be unrecoverable in an action of negligence or strict liability.

The jury returned a verdict for appellee which included a sum for the lost profits. It is apparent, therefore, that the verdict rested, at least in part, upon appellee's breach of

---

**2.** Appellee sued Swann, Elliott, and Firestone. Swann filed a third-party claim against Commercial. Seiberling, a wholly owned subsidiary of Firestone, was alleged to be Firestone's agent and was not itself sued.

**3.** Firestone offered evidence tending to show that the "blow-out" may have been caused by improper mounting of the tire. The lost evidence — certain parts and debris from the "blown-out" tire and a companion Firestone tire also purchased from Elliott — may have shed some light on that possibility.

**4.** Firestone does not allege that it would, in fact, have taken such action.

**5.** At some point, the actions against Elliott and Swann were dismissed by appellee.

warranty claims. Firestone contends that, because of appellee's failure to give it prior notice of the defect, appellee had no valid claim against it for breach of warranty and that the court erred in submitting that claim to the jury.

The issue is essentially one of statutory interpretation; but it is one that has significant public importance.

Title 2 of the Uniform Commercial Code (Md. Code Ann., Comm. Law art.) deals generally with the sale of goods. Subtitle 3 thereof, and in particular §§ 2-314 — 2-318, provides for certain implied warranties arising from the sale of goods. Subtitle 6 sets forth the rights and remedies that flow from the breach of a sales contract, including the breach of implied warranties imposed by subtitle 3. We start with this latter part — subtitle 6.

Section 2-601 gives a buyer three options "if the goods or the tender of delivery fail in any respect to conform to the contract. ..." He may "[r]eject the whole," "[a]ccept the whole," or "[a]ccept any commercial unit or units and reject the rest." The immediately succeeding sections (2-602 — 2-605) speak to the effect of a *rejection* by the buyer; sections 2-606 and 2-607 then discuss the effect of an *acceptance.* Section 2-606 defines an "acceptance." In relevant part, it provides that an "acceptance" occurs,

> "(a) After a reasonable opportunity to inspect the goods signifies *to the seller* that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (b) Fails to make an effective rejection. . . or
>
> (c) Does any act inconsistent with *the seller's* ownership; but if such act is wrongful as against *the seller* it is an acceptance only if ratified by him." (Emphasis supplied.)

Section 2-607 commences with the requirement that "[t]he buyer must pay at the contract rate for any goods accepted." It then provides, in subsection (3) (a) that "[w]here a tender has been accepted. . . [t]he buyer must within a reasonable time after he discovers or should have discovered any breach

notify *the seller* of breach or be barred from any remedy. . . ." (Emphasis supplied.)

The term "seller" is not defined with specific reference to subtitle 6. Section 2-103 (1) (d) provides, however, that "[i]n this title unless the context otherwise requires. . . *'Seller'* means a person who sells or contracts to sell goods." (Emphasis in the original.)

Subtitle 3, as we have noted, imposes upon sellers certain implied warranties that attach to the sale of goods; namely, a warranty of merchantability (§ 2-314 (1)) and a warranty of fitness (§ 2-315 (1)). Section 2-318 provides, in relevant part:

> "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home or any other ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. . . ."

Finally, § 2-314 (1), after imposing the implied warranty of merchantability, states:

> "Notwithstanding any other provisions of this title
>
> (a) *In §§ 2-314 through 2-318 of this title,* 'seller' includes the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer; and
>
> (b) Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer." (Emphasis supplied.)

Firestone acknowledges that through these provisions "[t]he Code expressly imposes potential warranty liability for every 'seller' in a distributive chain," without regard to any privity of contract. Its argument, founded largely upon concepts of economic fairness, is that the buyer's obligation under § 2-607 to give timely notice of defects must extend as far *up* the distributive chain as the seller's liability extends

*down* the chain. In light of the potential liability arising from these implied warranties, it says, a manufacturer "is in need of the protection which that notice affords at least as much as is the immediate seller." *Cf. Frericks v. General Motors Corp.,* 278 Md. 304, 313 (1976).

The Maryland appellate courts have not previously addressed this question. In *Frericks v. General Motors Corp., supra,* 278 Md. 304, and again in *Mattos, Inc. v. Hash,* 279 Md. 371 (1977), the Court of Appeals held that the notice requirement of § 2-607 (3) (a) did not apply to a person who was not a purchaser of the goods in question; but those decisions are of marginal relevance here. In the first place, they involved actions for personal injuries arising under § 2-318 rather than claims for economic losses, a distinction noted by the Court. *See,* in particular, *Frericks,* 278 Md. at 309, and *Mattos,* 279 Md. at 377. More important, the notice requirement was held to be inapplicable because the statute clearly imposed it only upon a "buyer," and neither plaintiff fell into that category. Those cases, in other words, focused not on the persons entitled to notice, but on the persons required to give it. *Compare* Official Comment 5 to § 2-607.

One of the earliest cases in which the issue before us was squarely (albeit tersely) addressed was *Tomczuk v. Town of Cheshire,* 217 A.2d 71 (Conn.Supp. 1965), an action against a bicycle manufacturer for injuries suffered as the result of defects in one of its bicycles. The injured plaintiff was the friend of a child whose parents had purchased the bicycle from a retailer. In terms of the notice requirement of § 2-607 (3) (a), the case thus presented the situation of a non-purchaser suing a "remote" seller; and the Court addressed both aspects of the issue. It first held that the "seller" entitled to notice under § 2-607 (3) (a) was only the immediate seller and not the more remote manufacturer. Each sale in the marketing chain was regarded as an independent transaction, with each buyer being obliged to notify only his seller. Although that conclusion would have sufficed to resolve the issue, the Court went on to conclude that, in any event, the notice requirement was not applicable because the claimant was not a "buyer." *See also Ruderman*

*v. Warner-Lambert Pharmaceutical Co.,* 184 A.2d 63 (Conn. Supp. 1962).

The Illinois Court reached a similar conclusion in *Goldstein v. G. D. Searle & Co.,* 378 N.E.2d 1083 (Ill.App. 1978). The plaintiff there sued the manufacturer of an oral contraceptive that she had purchased from a drug store, claiming that it was defective. The manufacturer defended on the ground of lack of required notice under § 2-607 (3), both to it and to the plaintiff's immediate seller — the drug store.

The plaintiff attempted to evade the notice requirement altogether by analogizing herself to the third-party beneficiary or non-purchaser in *Tomczuk* or *Frericks,* but the Court rejected that analogy. As a "subpurchaser," she was "a buyer in the distributive chain" and thus was subject to the requirement. The Court then turned to the nature of the requirement — to whom did the notice have to be given and who could take advantage of a failure to give such notice? It reasoned as follows:

(1) Although the general definition of "seller" — a person who sells or contracts to sell goods — is broad, its use in § 2-607 (3) (a) is necessarily limited "as a matter of syntax." 378 N.E.2d at 1086. That section requires notice of breach "[w]here a tender has been accepted."

(2) Section 2-503 (1) of the UCC states, in relevant part, that "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." The Official Comment to § 2-503 construes a "tender" as contemplating "an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed."

(3) This concept of "tender" connotes a transaction between a buyer and his immediate seller: "[T]he only tender which could have been accepted by plaintiff was that of her immediate seller, the retailer." 378 N.E.2d at 1086. Thus, "because section 2-607 (3) (a) provides for notification to the seller '[w]here a tender has been accepted,' we believe that

the word 'seller' as used in that section necessarily refers only to the immediate seller and, accordingly, we conclude that a buyer is required to give notice of breach only to his immediate seller." *Id.* at 1086.

(4) This approach, the Court concluded, would ultimately lead to the manufacturer being apprised of the alleged defect. At p. 1087:

> "It appears to us that section 2-607 (3) (a) provides such a requirement by viewing the acceptance of each tender of the goods moving down the distributive chain as a distinct and separate transaction. In this manner, whether one or more of those upstream of the consumer in the distributive chain is ultimately sued for breach of implied warranty by the consumer, the Code envisions that when the consumer's notice of breach is given to his immediate seller, such person to preserve any right of action he may have for breach of implied warranty will give notice to his immediate seller, and so on upstream until the seminal point of the distributive chain is reached." [6]

With considerably less discussion, appellate courts in Texas and Kansas reached the same conclusion. *See Vintage Homes, Inc. v. Coldiron,* 585 S.W.2d 886 (Tex.Civ.App. 1979), and *Carson v. Chevron Chemical Co.,* 635 P.2d 1248 (Kan.App. 1981). The Kansas Court acknowledged the economic fairness argument posited by the manufacturer, but rejected it in favor of the counter argument:

> "[I]n many instances a buyer would not know whether a particular defect or nonconformity could be remedied by the immediate seller or whether it was the manufacturer's responsibility. The immediate seller would be in the better position to make that determination. If the manufacturer would be

---

**6.** The Court went on to conclude that the manufacturer could raise as a defense the buyer's failure to give notice to his immediate seller. As such notice was given here, we need not (and do not) address that issue.

best able to correct the defect or problem, the immediate seller could then pass the notice of breach upstream to the manufacturer. If the immediate seller could promptly repair or correct the defect, then they could do so without the further delay caused by securing notification to the manufacturer."

*Carson,* 635 P.2d at 1255-56. *See also Greenman v. Yuba Power Products, Inc.,* 377 P.2d 897 (Cal. 1962); *Bennett v. Richardson-Merrell, Inc.,* 231 F.Supp. 150 (E.D.Ill. 1964); *Santor v. A and M Karagheusian, Inc.,* 207 A.2d 305, 313 (N.J. 1965); *Hickman v. Bross,* 58 Pa. D&C 2d 137, 12 UCC Rep. 480 (1972); 2 Anderson *Uniform Commercial Code* (2 ed. 1971), §§ 2-607:13, 2-607:14; *Wights v. Staff Jennings, Inc.,* 405 P.2d 624 (Or. 1965).

Several courts have concluded, or assumed, that § 2-607 (3) (a) *does* require timely notice to a "remote" seller.

In *Western Equipment v. Sheridan Iron Works,* 605 P.2d 806 (Wyo. 1980), the issue was "whether privity of contract is required or is not required in an action by a remote purchaser against a manufacturer to recover an economic loss." (Pp. 806-07.) The Court held that such privity was not required — that "any person who may reasonably be expected to use, consume, or be affected by the goods" could sue any seller in the distributive chain for breach of implied warranty. *Id.,* 810. The Court then addressed the adequacy of the notice that had, in fact, been given by the plaintiff to the manufacturer; and, in that context, and with hardly any discussion, it concluded, at p. 811: "Having held that privity is not required, we point out that furnishing notice under the statute is an obligation imposed upon one who asserts a right to relief as a buyer."

The Alaska Court has espoused the same view, and in essentially the same manner. In *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976), the Court dealt with "the liability of, a nonresident manufacturer of a defective mobile home that was purchased in Alaska from a resident seller." *Id.,* 281. The two major issues before the Court were whether the nonresident manufacturer was subject to

suit in Alaska and whether privity of contract was required for the recovery of economic loss. Both of those issues, at least tentatively, were decided adverse to the manufacturer. Having concluded that privity of contract was not required in an action based on implied warranty, the Court, without further explanation, announced at p. 292:

> "On the other hand, under the Code the consumer has a number of responsibilities if he is of [*sic*] enjoy the right of action we recognize today, not the least of which is that he must give notice of the breach of warranty to the manufacturer pursuant to AS 45.05.174 (c) (1)."

*Compare Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo. 1980), reversing *Prutch v. Ford Motor Co.*, 574 P.2d 102 (Colo.App. 1977). There, the consumer had given notice to his immediate seller who in turn had notified the manufacturer. In that circumstance, the Court held that direct notice from the consumer to the manufacturer was not required, leaving open the question of whether "notice of a breach of warranty must be given to a remote manufacturer in all cases." 618 P.2d at 661.

*See also San Antonio v. Warwick Club Ginger Ale Co.*, 248 A.2d 778 (R.I. 1968); *Redfield v. Mead, Johnson & Company*, 512 P.2d 776 (Or. 1973); and *Pritchard v. Liggett & Myers Tobacco Company*, 295 F.2d 292 (3d Cir. 1961), where the Courts tacitly assumed a requirement to notify a "remote" seller. Because such a requirement was assumed "without revealing any supporting legal reasoning," those cases were more or less dismissed as precedential authority by the Illinois Court in *Goldstein v. G. D. Searle & Co., supra*, 378 N.E.2d 1083. Also in accord with the view that notice to a "remote" seller is required is White and Summers *Uniform Commercial Code* § 11-10 (2d ed.).

Having no precedent to bind us, we look to the persuasiveness of the authority that exists in light of the Maryland statutes, as they have developed.

We approach this analysis with full awareness that there are good economic reasons in support of both approaches and

that there will likely be some "hard" cases and unfortunate results whichever interpretation is adopted. This case illustrates the prejudice that can accrue to a manufacturer or other remote seller if the buyer is required to notify only his immediate seller and no one else.

On the other hand, given the complex marketing chains through which many consumer goods flow nowadays — also illustrated by this case — it is not difficult to imagine the injustice that would be caused to consumers from requiring notice to each person in the chain. As Dean Prosser pointed out in *The Assault Upon The Citadel (Strict Liability To The Consumer)*, 69 Yale L.J. 1099, 1130 (1960), with respect to § 49 of the Uniform Sales Act — the predecessor to § 2-607 (3) (a):

> "Section 49 of the Sales Act further provides that the buyer cannot recover on a warranty unless he gives notice of its breach to the seller within a reasonable time after he knows, or ought to know, of the breach. As between the immediate parties to the sale, this is a sound commercial rule, designed to protect the seller against unduly delayed claims for damages. As applied to personal injuries, *and notice to a remote seller,* it becomes a booby-trap for the unwary. The injured consumer is seldom 'steeped in the business practice which justifies the rule,' and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings." (Emphasis supplied.)

Even *with* legal advice, we would add, the consumer may not become aware of all the potential "remote" sellers until judicial proceedings are commenced and discovery techniques bear fruit. In this case, for example, Commercial Tire Co.'s role did not apparently surface until Swann (also a "remote" seller) filed its third-party claim. If the statute pegged the notice requirement to a reasonable time after the buyer discovered each person potentially responsible for the breach, that aspect of the problem might be resolved; but

that is not how § 2-607 (3) (a) reads. The time begins to run when the breach itself is (or should be) discovered; and, at that point, the buyer may have no idea who is responsible for the defect.

The broader public policy considerations are, of course, relevant as we seek to determine what the General Assembly intended by its various enactments; but it is the statutes themselves that must govern. We cannot rewrite § 2-607 (3) (a) to make it say more (or less) than it does.

When the General Assembly enacted § 2-607 (3) (a) in 1964 as part of its adoption of the Uniform Commercial Code, the law was clear that an action could not be maintained by a buyer for breach of warranty — express or implied — absent privity of contract between the parties. *See Vaccarino v. Cozzubo,* 181 Md. 614, 616 (1943); *Blankenship v. Morrison Mach. Co.,* 255 Md. 241, 246 (1969); *Poplar v. Hochschild, Kohn & Co.,* 180 Md. 389 (1942). In that setting, the "seller" referred to in § 2-607 (3) (a) could have meant only the immediate seller. He was the one who tendered the goods; he was the one, under §§ 2-602 and 2-606, that the buyer had to notify of his election to accept or reject the goods; and he was the only one against whom the buyer had recourse. Thus, notwithstanding the broader general definition of the term in § 2-103 (1) (d), in the context of § 2-607 (3) (a) and its immediately adjacent sections, the term could have no other commercially reasonable meaning.

Unlike the situation in Wyoming *(Western Equipment v. Sheridan Iron Works, supra)* and Alaska *(Morrow v. New Moon Homes, Inc., supra),* where the need for privity of contract in actions on implied warranty was *judicially* abrogated, in Maryland the General Assembly repealed the requirement by statute. *See* Acts of 1969, ch. 249. It chose to do that by expanding the definition of "seller" in § 2-314 (1) and expanding the beneficiaries of implied warranties in § 2-318. Yet, with presumed (though perhaps not actual) cognizance of the necessary relationship between the warranty sections and the remedy sections, it declined to extend

the definition of "seller" in § 2-607 (3) (a), which, of course, it easily could have done.

The Legislature's failure to address § 2-607 (3) (a) when it abrogated the requirement of privity of contract raises at least three alternative inferences: (1) Aware that the notice requirement then extended only to the immediate seller, it desired to make no change; (2) it somehow assumed that the term "seller" in § 2-607 (3) (a) would automatically expand and become co-extensive with the statutorily expanded definition in § 2-314 (1); or, (3) and most likely, it never thought about the problem. We have no way of knowing for certain which of these inferences is the correct one. Of the three, however, the second, it seems to us, is the least compelling, especially in light of the title to the 1969 act describing the law as "enlarging the definition of 'seller' *as it applies to Sections 2-314 through 2-318. . . .*" (Emphasis supplied.)

The undeniable objective of the Legislature in the 1969 enactments was to give greater protection to consumers against defective products by expanding the number and types of people who could be liable for the harm done by such products. It gave no indication of any intent to cut back on that objective by placing a new and additional burden on consumers to notify people whom they may not know and with whom they have not dealt. In context, therefore, we think "the seller" as used in § 2-607 (3) (a) means only the immediate seller, as it always has. Each transaction in the marketing chain, for purposes of that section, is a separate one.

Remote sellers will have to rely on each successive buyer carrying out his respective obligation under the law, which, in most instances, he will have an economic incentive to do. If there is to be a hardship, it will have to fall on the manufacturer or distributor who placed or maintained the defective goods in the marketing stream.

In light of this conclusion, it becomes unnecessary for us to address Firestone's second question, of whether the filing of the lawsuit sufficed as notice.

*Judgment affirmed; appellant to pay the costs.*

*Lowe, J. concurring:*

I agree with the second alternative suggested by the majority that it is most likely that the Legislature never thought of the problem of notice when it exposed manufacturers to direct suits by ultimate consumers. For that reason I must concur in the result reached because the term "seller" used in the preexisting notice section (Md. Com. Law Code Ann., § 2-607 (3) (a) (1975)) was not consciously expanded to include manufacturers, etc., when enacted expressly to apply to the warranty sections (Md. Com. Law Code Ann., §§ 2-314 — 2-318 (1975)) for purposes of abolishing the privity requisites.

The bill enacting the change of definition of "seller" emanated from a constituent's letter to the then President of the Senate of Maryland, The Honorable William S. James. Noting the need for "careful scrutiny" of this issue, President James referred it to the Judicial Committee of the Legislative Council which adopted a draft as it now appears in § 2-314. Item No. 256 Legislative Council Reports explains that:

> "This bill recommended by the Judiciary Committee of the Legislative Council enlarges the definition of 'seller' as it aplies [sic] to Sections 2-314 through 2-318 of the Uniform Commercial Code, abolishes the requirement of privity in actions brought under these sections, extends a seller's expressed or implied warranty to third party beneficiaries, and generally relates to expressed and implied warranties in the Uniform Commercial Code. In testimony before the Judiciary Committee, it was discovered that Maryland is far behind other states in extending implied and expressed warranties to third party beneficiaries. This bill will cover a present gap in the Commercial Code in Maryland in situations where someone who actually did not buy a defective product might suffer injury in using it.

Although the reporter's explanation referring to the defi-

nition of "seller" used the limiting language "as it aplies [applies] to Sections 2-314 through 2-318", not everyone understood it as so clear a limitation on the application of the expanded definition. A Maryland Commissioner on Uniform State Laws, M. King Hill, wrote the Secretary and Director of Research for the Legislative Council that the bill amending the definition of seller was fraught with danger.

> "The intent of the amendments appears to be to dispense with the necessity of privity of contract in a breach of warranty action. If this is the intent, then I think the proposed amendment is poorly drafted. 'Seller' is already adequately defined in the UCC and I think it is very poor practice to amend Section 2-314 as proposed, which enlarges the definition of 'seller' *not only for tort claims but also generally,* and thus destroys the uniformity which is so highly desirable in the Uniform Commercial Code. Furthermore, as I see it, the amendment of Section 2-314 is unnecessary since 'seller' already includes those persons specifically referred to in the amendment as far as breach of warranty claims in tort are concerned." (Emphasis added).

Although Mr. Hill's alternative observation did not accord with the Court of Appeals, *Frericks v. General Motors Corp.,* 278 Md. 304, 309 (1976), his former appears to have been the view of the Legislatures of Maine and South Carolina. These two states amended their comparable sections of the notice section, § 2-607, expressly to indicate that their expanded definitions of "seller" did *not* apply in certain instances. Such action bears out Mr. Hill's concern that the expanded definition may indeed apply "generally" at least interpretatively.

But I must concede with the majority that if our Legislature had consciously intended the broader application it should have said so, or at the very least should not have restricted its application as it expressly did.

I do not agree with the moral rationale that either justice or "fair play" supports that result, nor can I imagine with the

majority that the Legislature could have been aware of the problem and desired to make no change. In a society surviving on mass production, the removal of the privity shield exposed the financial stability of manufacturers by creating an entire new vista of suits by plaintiffs and a fruitful field for specialization in the legal professions. To think that the Legislature would consciously effect such a revolutionary change and intentionally deprive fair warning, even to the exposed giants that a crippling blow may be struck, is insulting to the General Assembly. It is one thing to accuse it of lack of knowledge, forgivable in an era when it was beginning to emerge from an antiquated system. It is quite another to charge it with consciously invoking procedural unfairness.

This case particularly points out the immorality of permitting a plaintiff to sandbag-by-silence a manufacturer's investigatory opportunity to determine if it was at fault or, if not, where the fault lay. To rationalize as fair warning for a lack of notice requirement by suggesting that an installer will notify a retailer, who will notify a wholesaler, who will notify a distributor, who will notify a subsidiary, who will notify a manufacturer, is hardly convincing. That such a relay-team relationship would ever exist is not too likely, since here as in most cases, the initial seller and the ultimate manufacturer are not attacked upon related theories.

In this case the retailer, Elliott, apparently retained Swann, the installer, which Firestone suggests caused the blowout by pinching the tube upon an improper installation. Neither Elliott nor Swann had any great incentive to notify Firestone propitiously to investigate that possibility. Rather, the year and a half that elapsed during which the crucial evidence to make such determination disappeared, enured to their benefit when the deep-pocketed manufacturer was ultimately sued.

Firestone's experts are then left at trial years after the incident, to express an opinion of a "possibility" of the cause, the likelihood of which may be apparent even to a layman. But because of the lack of notice, any possible foundation to

support such opinion is lost; and of course, expert opinions are only as good as the foundation upon which they stand. "Deep-pockets" are thus inverted by plaintiffs' experts without any fear of contradiction by a factually supported explanation. Both less financially endowed, local defendants are dismissed in the meantime so that a local jury may not become confused by conflicting theories or local emotional prejudices. In most consumer oriented locales, the title of a case such as "John Doe v. Firestone" is a persuasive closing argument, while "John Doe v. local dealer" is fraught with obvious pitfalls.

The expansion of a notice requirement in accordance with § 2-607 (3) (a) clearly cannot limit a diligent consumer damaged by a warranty breach by a manufacturer. The "within a reasonable time" clause provides the same protection from an arbitrary bar to suit that the judicially created discovery rule provides in determining when a cause of action accrues for purposes of limitations. See *Poffenberger v. Risser,* 290 Md. 631 (1981).

I separately concur for two reasons. First to point out to the Legislature its obvious oversight in 1969 and secondly to remind the Court of Appeals (which needs no reminder) that not only may it inherently create new causes of action, *e.g., Teays v. Supreme Concrete Block,* 51 Md. App. 166, 167-169 (1982), and even abolish old ones, *e.g., Pope v. State,* 284 Md. 309, 340-343 (1979), but it is constitutionally endowed with the authority to regulate the *procedure* of the judicial process to ensure fair play. Md. Cts. & Jud. Proc. Code Ann. § 1-201 (1980 Repl. Vol.). Surely if time determinations for speedy trials are of a procedural nature (Md. Rule 746), the Court can establish notice requirements.

Procedural fair play, like procedural due process, must be equally provided not only to the poor or individual consumers but to the rich, and to corporate goliaths as well. As our preoccupation with the rights of indigent criminals ofttimes obscures an equal concern with the rights of victims, we must dispense justice with an equal hand even to those who appear strong enough to fend for themselves. We have made manufacturers "equally" vulnerable by abol-

ishing privity. They should be equally equipped to defend themselves fairly by reasonable forewarning.