The CHURCH OF THE NATIVITY
OF OUR LORD, Respondent,

v.

WATPRO, INC., Respondent,

Flag, S.p.A., a/k/a Flag, S.A.S., et al.,
MacArthur Company, Defendants,

Montedison, S.p.A., et al., Appellants.

No. C5–91–99.

Court of Appeals of Minnesota.

Aug. 20, 1991.

Review Granted Oct. 11, 1991.

Review Denied Nov. 26, 1991.

Elizabeth Hoene Martin, John D. Docken, Michael R. Docherty, Doherty, Rumble & Butler, P.A., St. Paul, for the Church of the Nativity of Our Lord.

Katherine L. MacKinnon, John T. Chapman, Arthur, Chapman & McDonough, P.A., Minneapolis, for WatPro, Inc.

Harry T. Neimeyer, Stringer & Rohleder, Ltd., St. Paul, for MacArthur Co.

Corey J. Ayling, McGrann Shea Franzen Carnival Straughn & Lamb, Chartered, Minneapolis, Anthony M. Watkins, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, Pa., for appellants.

Considered and decided by KALITOWSKI, P.J., and KLAPHAKE and AMUNDSON, JJ.

## OPINION

KLAPHAKE, Judge.

Respondent Church of the Nativity of Our Lord (Nativity) brought this action against Flag, S.p.A., WatPro, Inc. and MacArthur Co. in August 1987 for breach of express warranties, breach of contract, breach of implied warranties of merchantability and fitness for a particular purpose, failure of essential purpose, negligent misrepresentation and violation of the Minnesota Consumer Fraud Law regarding repairs made to Nativity's roof. A default judgment was entered against Flag in January 1988. On August 24, 1989, WatPro served a third-party complaint on Montedison, U.S.A. and Montedison, S.p.A. (collectively Montedison).

At trial, Nativity's motion to allow direct claims against Montedison was granted. At the same time, the trial court allowed WatPro and MacArthur to cross-claim against Montedison and Montedison to bring cross-claims against WatPro and MacArthur. The trial court denied all motions for a directed verdict.

By special verdict, the jury found that WatPro and Montedison breached express warranties and implied warranties of merchantability and fitness for use; that they were liable under theories of breach of contract and negligent misrepresentation; and that they violated the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69 (1990). The jury further found Montedison liable for misrepresentations to WatPro. The jury also concluded that Flag was an agent of Montedison and WatPro was an agent of Flag. As compensatory damages, the jury awarded Nativity $10,993.22 for roof repairs prior to replacement, $175,558 for roof replacement and $5,700.99 for interior damage caused by leaking.

The trial court denied Montedison's post-trial motions for judgment notwithstanding the verdict or a new trial and amended findings. The trial court granted Nativity's motion for prejudgment interest, costs and attorney fees. Judgment was entered against WatPro and Montedison jointly and severally for the full awards and in favor of WatPro for full indemnity. Montedison appeals from the judgment and order denying its post-trial motions. We affirm.

## FACTS

In early 1980, architect Larry Johnson of Voight and Fourre advised Nativity that the roofs on its convent and school needed repairs. Of two possible building contractors, Nativity selected Ampco, Inc. to make the repairs and signed a contract with Ampco on May 8, 1980 (first phase). The contract provided for the use of flagon roofing material, a PVC roofing membrane designed to form a water-tight barrier when placed on a roof. Ampco used flagon SF and flagon C on the Nativity roofing project.

Ampco purchased the flagon from defendant MacArthur Co., the regional supplier. MacArthur, in turn, purchased the flagon from WatPro, the sole distributor of flagon in the United States. WatPro purchased the flagon from Flag, who manufactured and shipped the flagon to WatPro in the United States. Flag manufactured the flagon under Montedison's supervision and

control. Montedison was the sole supplier and source of technology to Flag. Montedison, U.S.A. was the wholly-owned subsidiary of Montedison, S.p.A. and coordinated all phases of the marketing and distribution of flagon.

The first phase was completed in August 1980. Following completion of the roof installation, WatPro issued two consecutive five-year guarantees of the flagon material. The guarantees covered the periods 1980 through 1990.

Nativity and Ampco entered into a second contract on April 6, 1982, to repair the flat surfaces of the school building (phase two). This work was completed in July 1982. After completion, WatPro again issued two consecutive five-year guarantees covering the periods 1982 through 1987 and 1987 through 1992.

In December 1980, following the completion of phase one, Nativity representatives discovered a leak in the roof of the convent. Patching was undertaken at the same time the second phase of the reroofing project was completed. Soon after Ampco completed phase two, new leaks were discovered in the roof of the school. The cause of the leaks was determined to be the flagon material.

The roofs continued to shrink, split, crack, and tent through October 1984. Nativity's maintenance staff regularly inspected the roofs to avoid serious interior damage through leakage. Each time Nativity discovered a leak it notified Ampco, MacArthur and WatPro.

In November 1984, Nativity gave WatPro formal written notice of the continuing problem with the flagon and requested that WatPro either replace the flagon or repair it with an accompanying five-year extended guarantee. In response, WatPro authorized emergency repairs and extended the guarantee. Despite WatPro's repairs, however, the roofs continued to deteriorate. In February 1987, WatPro informed Nativity that it would not reimburse Nativity for any additional roof repairs unless Nativity released WatPro from all liability.

Nativity then hired Twin City Testing (TCT) to advise it on whether to replace or repair the roof. Nativity followed TCT's recommendation to remove and replace the flagon with a different roofing material to avoid further interior damage. The reroofing project was completed in August 1987 at a cost of $175,558.15. During the reroofing project, Nativity instituted this action to recover the cost of replacing the roof and other out-of-pocket expenses.

## ISSUES

I.   Does Minn.Stat. § 336.2–607 (1990) require notice of warranty defect to anyone other than an immediate seller?

II.   Did privity of contract exist between Nativity and Montedison?

III.   Was Nativity's cause of action against Montedison barred by any applicable statute of limitations?

IV.   Were Nativity's claims for negligent misrepresentation and violation of the Consumer Fraud Act preempted by the U.C.C.?

V.   Did the trial court err in: 1) allowing Nativity's claim under the Minnesota Consumer Fraud Act to go to the jury; or 2) in awarding attorney fees under the Minnesota Consumer Fraud Act?

VI.   Was there sufficient evidence to justify the jury's finding of liability against Montedison?

## ANALYSIS

### I.

■ Montedison first argues that the trial court erred in not concluding that the notice of defect provision in Minn.Stat. § 336.2–607(3)(a) (1990) requires notice to a remote manufacturer as well as an immediate seller. It contends that in order to hold a manufacturer liable for a buyer's losses, the manufacturer needs the same protection of timely notice as the buyer's immediate seller. Because this issue presents a pure question of law, this court has de novo review of the trial court's ruling. *See A.J. Chromy Constr. Co. v. Commercial*

*Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn.1977).

Minn.Stat. § 336.2–607(3)(a)[1] provides that a buyer must notify a "seller" of a breach of warranty within a reasonable time:

> (3) Where a tender has been accepted (a) the buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

Minn.Stat. § 336.2–503(1) (1990) defines "tender" to require the seller to "put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable the buyer to take delivery." The legislature has defined "seller" as one "who sells or contracts to sell goods." Minn.Stat. § 336.2–103(1)(d) (1990).

The notice requirement in a breach of warranty action serves three purposes: (1) it affords the seller an opportunity to correct any defect; (2) it provides the seller an opportunity to prepare for negotiation and litigation; and (3) it affords the seller a safeguard against stale claims being asserted after it is too late to investigate them. 1 J. White and R. Summers, *Uniform Commercial Code* § 11–10 at 554–55 (3d ed. 1988). Generally, compliance with the notice requirement is a condition precedent to recovery for a breach of warranty claim under the Uniform Commercial Code. *Id.* at 554.

The Minnesota legislature abrogated its privity requirement in 1969. 1969 Minn.Laws ch. 621, § 6. Under the new provision, a seller's warranty extends to any person who can reasonably be expected to use or to be affected by the goods and who was injured by the breach, irrespective of privity of contract. Minn.Stat. § 336.2–318 (1990). Prior to the abolition of the privity requirement, the Article 2 warranties ran only from the buyer to the immediate seller. Thus, the term "seller" in § 2–607(3)(a) clearly meant only the immediate seller. Since the abrogation of the privity requirement, however, it is unclear whether the term "seller" in § 2–607(3)(a) continues to mean the immediate seller or includes others in the chain of distribution. No Minnesota cases determine whether § 336.2–607(3)(a) requires a buyer to notify only the immediate seller, or whether a buyer must also notify the manufacturer in order to sue the manufacturer for breach of warranties. Thus, the issue is one of first impression in Minnesota.

Other jurisdictions are divided on the issue. In *Firestone Tire & Rubber Co. v. Cannon*, 53 Md.App. 106, 452 A.2d 192 (1982), *aff'd on opinion below*, 295 Md. 528, 456 A.2d 930 (1983), the Court of Special Appeals of Maryland held that notice to the immediate seller constituted sufficient notice to the manufacturer. That case involved a trucker who had purchased a Firestone tire for one of his tractors from a retail equipment company. *Id.*, 53 Md.App. at 107, 452 A.2d at 193. When the tire blew out, causing extensive damage, the trucker notified the retailer within a few days. *Id.* at 108, 452 A.2d at 193. The manufacturer, however, was not notified until a lawsuit was filed against it over a year later. *Id.*

The Maryland court articulated four reasons to support its holding. First, it examined the statutory language in light of existing case law and concluded that because the term "tender" contemplated a transaction between a buyer and the immediate seller, the word "seller" as used in the provision could only refer to the immediate seller. *Id.* at 112–13, 452 A.2d at 195. Second, the court reasoned that this interpretation would lead to the manufacturer ultimately being apprised of the alleged defect. *Id.* at 113, 452 A.2d at 195–96. Third, the court noted that it would be too onerous a burden to require a consumer to notify one with whom the consumer had no dealings. *Id.* at 116, 452 A.2d at 197. Finally, because the Maryland legislature failed to address § 2–607(3)(a) when it abro-

---

**1.** In enacting Minn.Stat. § 336.2–607(3)(a), the Minnesota legislature adopted § 2–607(3) of the Uniform Commercial Code without modification. *See State v. Patten*, 416 N.W.2d 168, 172 n. 2 (Minn.App.1987).

gated the privity requirement, the court concluded that the legislature had no intent to place "a new and additional burden on consumers to notify people whom they may not know and with whom they have not dealt." *Id.* at 118, 452 A.2d at 198.

Other courts have reached the same result without the detailed reasoning of *Firestone. See, e.g., Cipollone v. Liggett Group, Inc.*, 683 F.Supp. 1487, 1497–98 (D.N.J.1988) (stating § 2–607(3)(a) requires buyer to give notice only to immediate seller), *cert. granted,* —— U.S. ——, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991); *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 206 (Colo. 1984) (holding term seller in § 2–607(3)(a) refers only to seller who tendered goods to buyer); *Carson v. Chevron Chemical Co.*, 6 Kan.App.2d 776, 635 P.2d 1248, 1256 (1981) (in ordinary buyer-seller relationship § 2–607(3)(a) requires notice of breach to buyer's immediate seller only); *Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888 (Tex.Civ.App.1979) (stating § 2–607 notice requirement applies to buyer and immediate seller); *Tomczuk v. Town of Cheshire*, 26 Conn.Supp. 219, 222, 217 A.2d 71, 73 (1965) ("seller" in § 2–607 "obviously refers to the person who made the immediate sale to one who is his buyer"); *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 67–68, 207 A.2d 305, 313 (1965) (holding prompt notice to immediate seller sufficient against manufacturer).

Montedison, however, urges this court to adopt the reasoning of a line of cases holding that to hold a manufacturer liable for breach of contract losses, a buyer must give notice of the breach to the manufacturer. *See Western Equipment Co. v. Sheridan Iron Works, Inc.*, 605 P.2d 806, 810–11 (Wyo.1980) (where privity requirement is eliminated notice to manufacturer is necessary); *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279, 292 (Alaska 1976) (although privity between buyer and manufacturer not required, buyer must give notice of breach to manufacturer). We decline to do so.

We recognize that sound economic reasons support both interpretations of § 2–607(3)(a). We believe, however, that the correct interpretation of § 2–607 requires notice only to a buyer's immediate seller and not to other sellers in the chain of distribution.

This conclusion follows logically from a plain reading of the statute. Section 2–103(d) defines a seller as "a person who sells or contracts to sell goods." The notice of breach requirement in § 2–607(3)(a), however, is limited to instances "[w]here a tender has been accepted." The obligations of a seller in tendering goods to a buyer under § 2–503(1) contemplates a transaction between a buyer and the immediate seller. The notice provision of § 2–607(3)(a) thus is most logically interpreted as applying to the party that tendered the goods to the buyer, i.e. the immediate seller.[2]

In addition, the interests of the remote sellers (including the manufacturer) will be served, notwithstanding a requirement that the buyer only notify the immediate seller. The immediate seller can be expected to notify the manufacturer and parties further up the chain of distribution because the immediate seller should be in regular contact with other parties in the chain of distribution. The buyer, in contrast, may be making but a single purchase and consequently, is in a less favorable position to notify anyone but the immediate seller. Thus, if the manufacturer or other remote seller has an interest in correcting a problem, more prompt notice can be expected from the final seller.

Further, our interpretation of the statute that a buyer need only notify the immediate seller of a defect is consistent with the remedial nature of the statute. An immediate seller is much more likely to have the means to rectify a defect than a remote manufacturer. If the intended purpose of § 2–607(3)(a) is to provide the buyer with a means of correcting a problem, the purpose will most readily be served by requiring the

**2.** Accordingly, we need not decide whether the evidence supports the jury's finding that notice was given within a reasonable time.

buyer to give notice of the breach to the immediate seller.

## II.

Montedison further argues that because it was not in contractual privity with Nativity, it cannot be held liable for breach of contract. However, the jury found that Flag acted as an agent for Montedison and that WatPro acted as an agent for Flag. The record supports these findings. Since WatPro's status and actions as subagent of Montedison bind Montedison contractually, Montedison is in privity with Nativity for purposes of the breach of contract claim. *See Fedders Corp. v. Taylor*, 473 F.Supp. 961, 975 (D.Minn.1979).

## III.

Montedison next argues that the statute of limitations precludes consideration of Nativity's causes of action against it. Montedison contends that because Nativity's cause of action accrued in June 1982, and the third-party action against Montedison was not initiated until August 1989, Nativity's direct action is barred. Because there are no facts in dispute, this issue is one of law for the court. *See A.J. Chromy Constr. Co.*, 260 N.W.2d at 582.

The statute of limitations in sales contracts is set out in Minn.Stat. § 336.2–725 (1990):

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.

* * * * * *

(2) A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

*See also TCF Bank & Savings, F.A. v. Marshall Truss Systems, Inc.*, 466 N.W.2d 49, 52 (Minn.App.1991), *pet. for rev. denied* (Minn. April 29, 1991).

The jury found that Flag, Montedison and WatPro expressly warranted that the roof would remain watertight for ten years. These guarantees fall squarely within the exception in Minn.Stat. § 336.2–725(2). Because the jury found that Flag was Montedison's agent, Flag's guarantee of future performance bound Montedison. Although Montedison contests this finding, we conclude there is sufficient evidence in the record to support it. *See Bethesda Lutheran Church v. Twin City Constr.*, 356 N.W.2d 344, 349–50 (Minn.App.1984) (stating promise to repair roof estopped general contractor from asserting six-year statute of limitation), *pet. for rev. denied* (Minn. Feb. 5, 1985).

Here, Nativity's roof problems commenced in 1982. From 1984 until 1987 WatPro promised to repair the roof and extended its guarantee beyond the original ten-year period. Nativity did not discover that the flagon was inherently defective until 1987, after Flag and WatPro refused to honor their guarantees. Thus, based on *Bethesda Lutheran Church*, and the agency relationship between Montedison and WatPro, WatPro's promises of repair tolled the statute of limitations, bringing Nativity's direct cause of action against Montedison within the applicable statute of limitations.

## IV.

Montedison next argues that the U.C.C. preempts Nativity's and WatPro's tort claims. It contends that Nativity's claims for fraud and misrepresentation, and WatPro's claim for indemnification or contribution, are breach of warranty claims recast as tort claims and should therefore have been dismissed for failure to state a claim. We need not address Montedison's preemption argument because the jury awarded no punitive damages and Nativity's recovery in this case is identical under either the U.C.C. claims or the common law claims.

## V.

Montedison argues that this court should find: (1) the Consumer Fraud Act is inapplicable here because Nativity was not an

unsophisticated "consumer" with standing to sue under the law; (2) the law should not be construed to allowing a claim for negligent misrepresentation as the law contemplates some intentional wrongdoing; and (3) the trial court abused its discretion in awarding attorney fees for violations of the Consumer Fraud Act. We disagree.

The Minnesota Consumer Fraud Act provides in part:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Minn.Stat. § 325F.69, subd. 1 (1990). Montedison's first argument is contrary to the language of the statute and case law. The statute does not limit recovery to unsophisticated consumers. Moreover, case law has not limited the scope of the statute to consumer transactions. *See Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1304 (D.Minn.1988) (holding Act applies in products liability action).

Montedison's second contention that the Act applies only to intentional wrongdoing is also contrary to case law. Minnesota courts have held that a finding of negligent or unintentional misrepresentation violates the Act. *See, e.g., Eager v. Siwek Lumber & Millwork, Inc.*, 392 N.W.2d 691, 695 (Minn.App.1986), *pet. for rev. denied* (Minn. Oct. 22, 1986); *Yost v. Millhouse*, 373 N.W.2d 826, 831 (Minn.App. 1985).

Finally, Montedison's argument that the trial court abused its discretion in awarding attorney fees contradicts the Act's intent. The statute is designed to encourage persons to "stop the fraudulent activity covered by the act." *Yost*, 373 N.W.2d at 832. Here, the jury found that Montedison and WatPro knowingly caused the product to enter the stream of commerce, and further found that they knew or should have known that the product could not meet their representations of quality. Given this finding, we conclude the trial court properly awarded attorney fees.

## VI.

Finally, Montedison argues that there is insufficient evidence for the jury to find Montedison, U.S.A. was a co-venturer with Montedison, S.p.A. The special verdict finding that Montedison, U.S.A. and Montedison, S.p.A. engaged in a joint venture with respect to marketing and manufacture of flagon material will be set aside only where it is "perverse and palpably contrary to the evidence." *See Jacobs v. Rosemount Dodge–Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981).

Here, the evidence showed that Charles Messenger, former vice-president for WatPro, had extensive discussions during the late 1970's and 1980's with Montedison, U.S.A. and Montedison, S.p.A. regarding a joint venture in Europe. Further, Montedison, S.p.A. met with the vice-president of Montedison, U.S.A. to discuss the advertising and marketing program for flagon. They also spoke with Montedison and Flag officials in Italy to review production, manufacturing, and quality control facilities. Moreover, there were extensive discussions as to how WatPro would carry out the introduction of flagon in the United States. The jury's verdict is not inconsistent with the evidence.

## DECISION

Affirmed.