**BROOKINGS MUNICIPAL UTIL-ITIES, INC., and City of Brook-ings, South Dakota, Plaintiffs,**

v.

**AMOCO CHEMICAL COMPANY, a cor-poration, a/k/a Amoco Chemicals Company; Amoco Reinforced Plastics Company, a wholly owned subsidiary and alter ego/instrumentality of its parent, Amoco Chemical Company, Defendants.**

No. Civ 97–4243.

United States District Court,
D. South Dakota,
Southern Division.

May 26, 2000.

Robert L. Morris, Quinn, Day & Barker, Belle Fourche, SD, Gregory A. Eiesland, Johnson, Eiesland, Huffman & Clayborne, Rapid City, SD, David Griffin, San Diego, CA, for plaintiffs.

Michael L. Luce, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, Richard C. Godfrey, Andrew A. Kassof, Scott W. Fowkes, Kirkland & Ellis, Chicago, IL, Randall S. Henderson, Pasadena, CA, for defendants.

### AMENDED MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The defendants, Amoco Chemical Company and Amoco Reinforced Plastics Company (ARPCO), have filed a Motion for Summary Judgment on the Merits of the Complaint filed against them by the plaintiffs, Brookings Municipal Utilities, Inc. and the City of Brookings, South Dakota. After the Court's previous Memorandum Opinion and Order on the Motion for Summary Judgment, defendants' filed a Motion for Reconsideration of the Order. For the reasons stated below, defendants' Motion for Summary Judgment is granted in part and denied in part, and the Motion for Reconsideration is denied.

### BACKGROUND

Between 1975 and 1980, plaintiffs oversaw the construction of a sewer line, the "Southwest Interceptor," that ran between Brookings and a wastewater treatment facility three miles south of town. The Southwest Interceptor included 14,855 feet of Techite II pipe (hereinafter sometimes referred to simply as "Techite pipe"), which was sold to a private contractor by the defendants. In 1996, after a break in the Techite pipe in 1983 and two more

breaks in 1996, plaintiffs replaced all of the Techite pipe in the Southwest Interceptor. In 1997, plaintiffs filed this lawsuit, alleging that the pipe was defective, and seeking damages caused by the alleged defects in the pipe.

The process of building the Southwest Interceptor began in 1975. That year, the City of Brookings hired Banner Associates, Inc. ("Banner"), to engineer and design the pipeline. Banner's senior engineer, Fred Rittershaus, served as the project director, and began the process of designating certain types of reinforced fiberglass pipe as suitable for use in the Southwest Interceptor. In the course of designating such materials, Rittershaus received information about Techite pipe from Chuck Conklin, a representative of ARPCO. At the time, ARPCO was a wholly owned subsidiary of Amoco and the manufacturer of Techite pipe.

The information which Rittershaus received from Conklin included several representations about the qualities of Techite II pipe. For instance, Conklin wrote Rittershaus a letter stating that the defendants manufactured Techite II "in accordance with ASTM D 3262–76 (Sewer Pipe)." An Amoco brochure which Conklin gave to Rittershaus also stated that Techite II met the requirements of ASTM D 3262, and additionally stated that the pipe would "perform satisfactorily after an extended period (50 years) of operation under commonly encountered and anticipated conditions." Techite II's projected life of 50 years was linked to its ability to resist corrosion and its qualification for the ASTM sewer pipe specification. In his deposition, Rittershaus testified that these statements were important to him in deciding whether Techite II was suitable for the Southwest Interceptor.

Despite the statements in defendants' sales literature, there is evidence to suggest that Techite II did not meet the specifications of ASTM D 3262, and that defendants knew it. For example, a memorandum produced by defendants, dated April 26, 1974, discusses the "problems we are having with Type 2—both in not qualifying for the ASTM and severe leaking at Hydro testing." Defendants apparently tried to fix the problems with Techite II over the next several years. In 1977, a "dossier" prepared by Amoco employees to "provide factual summaries for rebuttal arguments in defense" of Techite pipe, stated that there had been "no Techite strain-corrosion field problems with pipe made to ASTM D3262, since 1973." In 1977, however, a memorandum describing a meeting of Amoco and ARPCO employees to discuss a "five-year (1978–1983) strategy study" on "marketing, manufacturing, research and licensing of Techite pipes" listed, as a research goal: "Solve cracking and strain corrosion problems." [1] As late as August 18, 1980, another memo that was being circulated by a former ARPCO employee continued to discuss corrosion problems with Type 2 Techite pipe.[2] In particular, the memo stated:

1. Although defendants have objected that this document is inadmissible hearsay, the document qualifies as an admission of a party-opponent and is thus admissible under Rule 801(d)(2). Defendants have not challenged the authenticity of the document. *See H. Sand & Co., Inc. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir.1991) (Rule 56(e) did not require a plaintiff to authenticate documents which the defendant claimed were hearsay, where the defendant did not challenge their authenticity prior to the district court's ruling on summary judgment).

2. In their Motion for Reconsideration, defendants state for the first time that the apparent author of this memorandum, R.W. Heinze,

was no longer working for ARPCO at the time the memorandum was written in August of 1980. (According to the summary judgment record, Heinze was employed at ARPCO from 1974 through at least December of 1979.) Based on this information, defendants argue that Heinze's statements in the memorandum are irrelevant and inadmissible hearsay, and thus unavailable for consideration on summary judgment. The statements in the memorandum are clearly relevant to plaintiffs' claims of deception and misrepresentation. Defendants have waived their hearsay argument by failing to raise it prior to the Court's ruling on summary judgment. *See McCoy v. Macon Water Authority*, 966 F.Supp. 1209, 1222–23 (M.D.Ga.1997) (on motion for recon-

Problems have been encountered with the ASTM test method both by us and apparently others in the industry. It appears that no one can literally meet it but no one will admit it.

There is no evidence that the "problems" defendants had in getting Techite II to meet the ASTM requirements were ever disclosed to plaintiffs or to Banner.

Through Banner, Brookings advertised the Southwest Interceptor project for bids, and listed Techite pipe as one of five kinds of fiberglass reinforced pipe which were suitable for the project.[3] North Central Underground ("NCU") submitted the lowest bid which, upon Banner's recommendation, Brookings accepted. NCU entered into a contract with Brookings on February 27, 1979 and, on its own initiative, opted to use Techite II as sewer pipe for the project.[4] On March 7, 1979 NCU ordered from Amoco 14,855 feet of 30–inch Techite T–2 gravity pipe. On March 30, Amoco certified that the pipe and fittings which it would supply for the Southwest Interceptor "will meet or exceed all of the requirements of ASTM D–3262." On March 31, 1979, the first loads of Techite II were delivered to Brookings by rail. Afterwards, on April 23, 1979, NCU began work on the project. On May 29, 1979, Amoco certified that the pipe which it had supplied "meets all the requirements of ASTM/ANSI D–3262–76 for Type 1, Grade 1 reinforced plastic mortar sewer pipe."

Apparently after NCU had laid all 14,-855 feet of the Techite pipe, Rittershaus wrote to NCU to notify NCU about problems with pipe deflection. ARPCO's Tech-

ite brochure indicated that pipe corrosion could be accelerated by strain induced by deflection in Techite pipe, and stated that "[m]aximum ring deflection is limited to 5% of the nominal pipe diameter." The letter, a copy of which was also sent to ARPCO, noted that 117 sections of pipe had deflections between 5% and 10%, and an additional 14 sections of pipe had deflections greater than 10%. In response, an ARPCO service manager wrote to Banner, stating that "[t]he strain level at 7.5% deflection will still be within the parameters of ASTM–D–3262 corrosion resistance guidelines," with the only effect being "a small reduction in the safety factor at 50–years life." Rittershaus asked for additional data to support ARPCO's conclusion that the deflection criteria could be relaxed from 5% to 7.5%. On January 3, 1980, Rittershaus received a report indicating that such a relaxation would be within the safety margin after fifty years of service life. Apparently, all of the deflections in the pipeline greater than 7.5% were corrected. On November 6, 1980, after Banner certified and recommended the Southwest Interceptor project for approval, Brookings Municipal Utilities accepted ownership of the pipeline.

After installation, the Southwest Interceptor suffered three corrosion-related incidents. On April 25, 1983, a twenty-foot section of pipe broke, necessitating repair of the pipe and prompting Rittershaus to advise NCU and Amoco of the problem. Almost thirteen years later, on April 14, 1996, a motorist named Heidi Aylward drove her car into what she thought was a mud puddle, but which turned out to be a

---

sideration, any arguments which the moving party inadvertently failed to raise earlier are deemed waived). In any event, aside from the information in the memorandum, there is sufficient evidence in the rest of the record for plaintiffs to present their claims of fraud, deceit, misrepresentation and deceptive trade practices to a jury. Except to the extent that it is addressed in this Amended Memorandum Opinion and Order, the Motion for Reconsideration is therefore denied.

3. Fiberglass reinforced pipe was approved for use in one portion of the Southwest Intercep-

tor. Banner also approved seven other types of thirty inch sewer pipe and two types of thirty-three inch sewer pipe for the same portion of the Southwest Interceptor, as well as additional types of pipe for other parts of the interceptor.

4. James Nass, an engineer for the City of Brookings, testified that he thought "dollars" motivated NCU's decision to select Techite pipe, but admitted that his testimony was "pure speculation."

fifteen-foot deep sinkhole caused by a break in the sewer line. Another break was discovered in June of 1996. After this third break, plaintiffs determined that a majority of the pipeline was damaged, and decided to replace all of the Techite pipe in the Southwest Interceptor at a cost of $1,056,788. Plaintiffs did not discuss the problems with the pipeline with representatives from the defendants or NCU before replacing the pipeline, or before filing this lawsuit.

Plaintiffs' Complaint contains six counts: (1) strict products liability; (2) negligence; (3) breach of express warranty; (4) breach of implied warranty; (5) fraud, deceit and misrepresentation; and (6) deceptive trade practices. Defendants have moved for summary judgment on all counts of the Complaint.

### DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir.2000). Because jurisdiction in this case is premised on diversity of citizenship, defendants' motion is governed by the law of South Dakota. *See id.* If the state law on any issue is ambiguous, the Court must predict how the South Dakota Supreme Court would resolve that issue. *See id.*

### A. Strict Products Liability and Negligence Claims

"The general rule is that economic losses are not recoverable under tort theories; rather, they are limited to the commercial theories found in the UCC." *City of Lennox v. Mitek Industries, Inc.*, 519 N.W.2d 330, 333 (S.D.1994) (adopting the economic loss doctrine in South Dakota).[5] While this general rule prohibits tort recovery for purely economic losses caused to a defective product itself, it allows recovery in tort when a defective product causes either personal injury or damage to property other than the specific goods that were part of the transaction, *Id.; see also East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866–75, 106 S.Ct. 2295, 2299–2304, 90 L.Ed.2d 865 (1986) (sitting in admiralty, but reasoning from land-based common law). In addition, some courts have allowed a tort remedy to plaintiffs seeking to recover the expense of preventing personal injuries which are likely to have been caused by an unreasonably dangerous product. *See 80 South Eighth Street Ltd. Partnership v. Carey–Canada, Inc.*, 486 N.W.2d 393, 397–98 (Minn.1992) (asbestos removal) (citing other asbestos removal cases). Contrary to plaintiffs' arguments, their tort claims do not fall within these exceptions to the economic loss doctrine.

As consequential losses caused by alleged defects in the Techite pipe, the costs of replacing the pipe are purely economic losses for which plaintiffs cannot recover in tort. *See City of Lennox*, 519 N.W.2d at 333–34 (barring tort recovery for "repair costs that fall under consequential damages"). Nor can plaintiffs obtain a tort remedy for their economic losses simply by claiming that defects in the pipe caused a separate injury to a person or other property. The "personal injury" and "other property" exceptions are limited to

---

**5.** The economic loss doctrine, as adopted in South Dakota, applies to the torts of negligence, *City of Lennox*, 519 N.W.2d 330 (S.D. 1994) and strict products liability, *Agristor Leasing v. Spindler*, 656 F.Supp. 653, 655–56 (D.S.D.1987). The South Dakota Supreme Court has not yet addressed whether the doctrine applies to torts involving commercial misrepresentation, and defendants do not argue that it bars plaintiffs' claims of fraud, deceit, misrepresentation and deceptive trade practices. *See All–Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 864–67 (7th Cir. 1999) (discussing the arguments for and against application of the economic loss doctrine in cases alleging commercial misrepresentation).

recovery of those specific types of harm; the mere occurrence of such damages does not create a tort remedy for purely economic losses. *See Corsica Coop. Ass'n v. Behlen Mfg. Co., Inc.*, 967 F.Supp. 382, 387 (D.S.D.1997) (holding that the economic loss doctrine barred tort recovery for damages to a defective grain bin and the corn inside it, but not for damages to two vehicles parked nearby). Thus, plaintiffs' tort claims must be limited to damages for any alleged injury to persons or "other property," as allowed by the economic loss doctrine.

Plaintiffs cannot recover any such damages. Although plaintiffs claim that Heidi Aylward suffered personal injuries when she drove into the sinkhole, they have admitted that they are not seeking any damages for personal injuries to Ms. Aylward or anyone else. Plaintiffs do claim that they are seeking damages to "other property" in the form of "damage to the bedding, backfill material and placement" of the pipe. Like the costs of replacing the pipe, however, these types of damages are consequential losses whose recovery is barred under the economic loss doctrine. *See City of Lennox*, 519 N.W.2d at 333–34 (barring recovery for the cost of removing insulation and sheet metal in the process of replacing defective trusses). Plaintiffs thus cannot recover any damages under the "personal injury" or "other property" exceptions.

■ Plaintiffs cannot obtain a tort remedy for their replacement costs by characterizing those expenditures as an effort to prevent personal injuries in the future. In *Carey–Canada*, the Minnesota Supreme Court allowed a building owner to proceed in tort for damages relating to the maintenance, removal and replacement of asbestos, where the owner claimed that the asbestos was "highly dangerous to humans." *Carey–Canada*, 486 N.W.2d at 397. The court's decision to allow a tort remedy, however, was not based simply on the dangerousness of asbestos, but rather on the court's observation that the danger posed by the asbestos—asbestosis—was not foreseeable at the time the asbestos was purchased, *Id.* ("[T]he risk posed by materials containing friable asbestos 'is not the type of risk that is normally allocated between the parties to a contract by agreement.' ") (quoting *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 978 (4th Cir.1987)). In fact the court indicated that the failure of asbestos to "perform satisfactorily as fireproofing"—a failure which could itself constitute an unreasonably dangerous condition—would not support a claim for economic loss:

> The claim here is not that the fireproofing failed to perform satisfactorily as fireproofing. Such a claim arising from the failure of the product to meet expectations of suitability, quality and performance resulting in damages which a party to a sales contract could reasonably expect would flow from a defect in the product is a benefit of the bargain claim better addressed under contract and the Uniform Commercial Code.

*Id.* Similarly, the dangers of personal injury, property damage, and liability under the Clean Water Act, which plaintiffs claim would have been caused by the failure of the pipe, were all foreseeable consequences of defective pipe when Banner approved Techite pipe for the Southwest Interceptor and NCU purchased the pipe from Amoco. Because plaintiffs' claims are fundamentally different from the claims in *Carey–Canada*, there is no reason to decide whether the South Dakota Supreme Court would adopt the rationale of that case, and no basis for allowing plaintiffs to recover under theories of products liability.

### B. Breach of Warranty Claims

■ Under § 2–607(3) of the UCC, where a tender of goods has been accepted, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." SDCL 57A-2-607(3). The purpose the notice requirement is to: (1) give the seller sufficient time to investigate the breach of

warranty claim while the facts are still fresh; (2) foster settlement through negotiation; (3) allow the seller to avoid future defects; (4) allow the seller to minimize damages; and (5) protect the seller from stale claims. *Hepper v. Triple U Enterprises, Inc.*, 388 N.W.2d 525, 527 (S.D. 1986). Plaintiffs have conceded that they failed to give notice of breach to NCU or defendants before filing this lawsuit. Instead, plaintiffs argue that the notice requirement does not apply to them because they are not "buyers" of the Techite pipe and that, under the circumstances of this case, their failure to provide notice under § 2–607(3) should be excused.[6] Neither of these arguments is persuasive.

■ Plaintiffs were required to provide notice of breach to "the seller" under § 2–607(3). The notice requirement "is a fundamental prerequisite of a buyer's recovery for breach of warranty." *Ehlers v. Chrysler Motor Corp.*, 88 S.D. 612, 226 N.W.2d 157, 159 (1975). Plaintiffs contend that they are exempt from the notice requirement, arguing that they are not "buyers" under § 2–607(3) because they did not buy the Techite pipe from defendants. As defendants point out, the cases which plaintiffs cite for this proposition involved allegations of personal injury by a plaintiff who did not purchase the product by which he was injured. *See Cole v. Keller Indus., Inc.*, 132 F.3d 1044 (4th Cir.1998) (employee injured while using ladder purchased by his employer); *Yates v. Pitman Mfg., Inc.*, 257 Va. 601, 514 S.E.2d 605 (1999) (workman injured by crane being used to deliver coal to his employer). In contrast, plain-

tiffs bought the Techite pipe from NCU, and are therefore "buyers" required to provide notice under the statute.

That does not mean that plaintiffs were required to provide notice directly to defendants. A majority of courts addressing the issue have interpreted the language of § 2–607(3) as contemplating only "a. transaction between the buyer and the immediate seller," and thus as requiring notice only to "the party that tendered the goods to the buyer, i.e. the immediate seller." *See Church of Nativity v. WatPro, Inc.*, 474 N.W.2d 605, 609–10 (Minn.App.1991) (listing cases), *aff'd on other grounds*, 491 N.W.2d 1 (Minn.1992); *Cooley v. Big Horn Harvestore Systems, Inc.*, 813 P.2d 736, 741–42 (Colo.1991) (en banc) (listing additional cases).[7] One court has recognized an exception to the immediate seller rule, requiring notice to a remote manufacturer by an end-buyer who dealt directly with the manufacturer in consummating the sale of the product. *See Carson v. Chevron Chem. Co.*, 6 Kan.App.2d 776, 635 P.2d 1248, 1256 (1981). In this case, the immediate seller was NCU, the defendants were the remote manufacturers, and plaintiffs, through Banner, worked closely with both NCU and the defendants. There is no reason, however, to decide whether the South Dakota Supreme Court would adopt the immediate seller rule and deem notice to NCU sufficient under § 2–607(3), or whether it would require notice to defendants under the exception articulated in *Carson*, because plaintiffs did not notify NCU of the breach. *See In re Air Bag Prod.Liab.Litig.*, 7 F.Supp.2d 792, 804 n.

---

6. Plaintiffs' argument might also be phrased as claiming that, in the context of this case, notice by lawsuit meets is sufficient under § 2–607(3). While the adequacy of notice of breach is generally a question of fact, "where the circumstances are such as to lead to only one reasonable conclusion, the question is one of law." *Vander Eyk v. Bones*, 77 S.D. 345, 91 N.W.2d 897, 901 (1958). As discussed in the text below, notice by lawsuit is inadequate under § 2–607(3) as a matter of South Dakota law.

7. This interpretation is based primarily on the plain language the words "tender," "the buy-

er" and "the seller" in § 2–607(3). *See* Ronald A. Anderson, *Uniform Commercial Code*, § 2–607:128 (1997) ("the Code does not speak of 'a' buyer or 'any' buyer, as being required to give notice, but rather of 'the' buyer, who, of course should be 'the buyer' to whom the seller allegedly liable for breach of warranty has sold the goods"). It has also been based on the presumption that the immediate seller will in turn inform the manufacturer, thus satisfying the policy goals of § 2–607(3). *See Church of the Nativity*, 474 N.W.2d at 610 ("The immediate seller can be expected to notify the manufacturer and the parties further up the chain of distribution. . . .").

18 (even though the Texas Supreme Court had expressly reserved judgment on whether notice to an immediate seller satisfies the requirements of § 2–607(3), recovery was barred where plaintiffs made no attempt to notify either the manufacturer or the immediate seller).

■ Plaintiffs have not pointed to any circumstances which could excuse their failure to provide notice prior to filing this lawsuit. While plaintiffs claim that defendants knew about defects in Techite pipe from problems with other buyers, a seller's actual knowledge of defects does not excuse a buyer from providing notice of breach:

> The notice "of the breach" required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*American Mfg. Co. v. United States Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir.1925) (Learned Hand, J.); *see also Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 266–67 (4th Cir.1998) (describing the continuing widespread adherence to Judge Hand's description of the notice requirement).[8] Plaintiffs' argument that notification would have "delayed replacement" and "continued to expose the public to an unreasonable risk of harm" is unpersuasive, because plaintiffs fail to explain how defendants could have delayed replacement of the pipe.[9] Finally, the argument that defendants had an opportunity to negotiate with plaintiffs and investigate plaintiffs' claims shortly after the lawsuit was filed also fails to excuse plaintiffs' failure to provide notice. *Hepper*, 388 N.W.2d at 529 ("Notice of breach by summons and complaint is obviously insufficient since it clearly frustrates the purposes of timely notice.") Because there was no adequate notice, plaintiffs are barred from a remedy for breach of warranty under § 2–607(3).

**C. Fraud, Deceit and Deceptive Trade Practices Claims**

■ As alleged in this case, plaintiffs' causes of action for fraud,[10] deceit[11]

---

**8.** In *Church of the Nativity v. WatPro, Inc.*, 491 N.W.2d 1 (Minn.1992), the Minnesota Supreme Court suggested that notice may be excused "[w]here the record discloses prior knowledge of similar complaints," because "the defendant will already have investigated the possible causes and therefore cannot argue that it is prejudiced by any delay in receiving notice of the specific complaint." *Church of the Nativity*, 491 N.W.2d at 5. That statement, however, is dictum, because the court in that case did not excuse notice, but rather found that the seller had been given constructive notice through its agents. *Id.* at 6. In addition, *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 19 Ill.Dec. 208, 378 N.E.2d 1083 (1978), the case on which *Church of the Nativity* relied for its dictum, has been limited by the Illinois Supreme Court to cases involving personal injuries to consumers. *Board of Educ. of City of Chicago v. A, C, & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 596 (1989).

**9.** Plaintiffs do argue that "any type of notice to Amoco to provide them a chance to replace the Southwest Sewer Interceptor Project" would have had this effect, but do not cite any authority indicating that they would have been obligated to permit defendants to replace the pipe, which plaintiffs had already accepted. *Compare* SDCL 57A–2–508 (seller's right to cure prior to acceptance).

**10.** Under South Dakota law, the essential elements of fraud are: (1) a representation made as a statement of fact; (2) which was untrue and known to be untrue by the party making it, or else recklessly made; (3) which was made with intent to deceive and for the purpose of inducing the other party to act upon it; (4) which was actually relied upon by the other party; and (5) which thereby induced the other party to act to its injury or damage. *Stene v. State Farm Mut. Auto. Ins. Co.*, 583 N.W.2d 399, 404 (S.D.1998).

**11.** Deceit is a statutory cause of action under which "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20–10–1. "A deceit within the meaning of § 20–10–1 is either (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) The assertion, as a fact, of

and deceptive trade practices [12] all require proof of an intentional misrepresentation or concealment of fact on which plaintiffs relied and which caused an injury to them. Defendants argue that plaintiffs cannot establish any of these causes of action because: (1) defendants did not make any misrepresentations about Techite pipe to Rittershaus or plaintiffs; (2) neither Rittershaus nor plaintiffs relied on any misrepresentations made by defendants; and (3) any misrepresentations on which plaintiffs might have relied could not have caused their alleged damages. Contrary to defendants arguments, there remain disputed issues of material fact as to each of these elements.

There is an issue of fact as to whether defendants misrepresented the attributes of Techite pipe to Rittershaus. As defendants point out, Rittershaus testified that he is personally unaware of any untrue statements in the Techite information which was provided to him, and that he has no information that the sewer pipe did not meet the specifications of ASTM D 3262. (Rittershaus Dep. at 38:15–39:1; 126:10–19.) However, plaintiffs have produced separate evidence suggesting that the documents Rittershaus received from defendants falsely stated that Techite pipe met the criteria of ASTM D 3262 and that it would last for fifty years. This evidence indicates that Techite II did not qualify for ASTM D 3262 in 1974, and that it would not last for its projected life of 50 years. Additional evidence indicates that defendants were still trying to solve "cracking and strain corrosion problems" in 1977, at the same time they were telling potential

customers that Techite II did not suffer from such problems in the field. Finally, the evidence suggests that Techite II did not meet ASTM standards as late as August 18, 1980, after all of the Techite pipe in the Southwest Interceptor had been laid, but before plaintiffs had accepted ownership of the pipeline. The portion of evidence which is contained in documents generated by defendants and their former employee supports the inference that the defendants' alleged misrepresentations were made knowingly and with the intent to deceive Rittershaus.

Defendants cannot escape liability to plaintiffs for their alleged misrepresentations simply because they did not make any statements directly to plaintiffs. Defendants may be liable to plaintiffs, even if plaintiffs only received misrepresentations through Rittershaus.

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Restatement (Second) of Torts*, § 533 (1977) (cited in *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 503 (S.D. 1990)). Thus, an automobile dealer who makes false representations as to the quality of a car is liable, not only the person to whom he sells the car, but also to third

---

that which is not true, by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact by one who is bound to disclose it, or who gives information or other facts which are likely to mislead for want of communication of that fact; or (4) A promise made without any intention of performing." SDCL 20–10–2.

**12.** South Dakota's statutes on Deceptive Trade Practices and Consumer Protection, SDCL Chapter 37–24, provide a cause of action for damages to any person who claims to

have been adversely affected by any act or practice declared to be deceptive under § 37–24–6, for the recovery of actual damages suffered as a result of the act or practice. SDCL 37–24–31. Under § 37–24–6, it is a deceptive act or practice to "[k]nowingly and intentionally act, use or employ any deceptive act or practice, fraud, false pretense, false promises or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived or damaged thereby."

persons who purchase the car from the dealer's buyer in reliance on the misrepresentations. *Clark v. McDaniel,* 546 N.W.2d 590, 593–94 (Iowa 1996). Based on the facts of this case, a jury could reasonably find that defendants had reason to expect that their representations to Rittershaus about Techite II would be communicated to plaintiffs, and that the representations would ultimately influence plaintiffs' decision to purchase the sewer pipe as part of the Southwest Interceptor.

There is also evidence to support an inference that Rittershaus and plaintiffs relied on defendants' alleged misrepresentations. In his deposition, Rittershaus indicated that plaintiffs were relying on him to identify sewer pipe which would be suitable for the Southwest Interceptor, by testifying that Brookings Municipal Utilities "wanted to get the best bid with a pipe that would meet the specifications we [Banner] developed." Rittershaus also testified that he relied on the documents he received from defendants to the extent that they stated that Techite II was "resistant to corrosive environments," "exceed[ed] the rigorous requirements" of ASTM D 3262, and would have a service life of fifty years or more. Whether Rittershaus and plaintiffs were justified in relying on those statements is a question of fact for the jury.

Plaintiffs' 30(b)(6) deposition testimony does not bar them from producing evidence to support these theories of misrepresentation and reliance. Andrew Jensen, plaintiffs' Rule 30(b)(6) representative, testified that he had no knowledge of any

misrepresentations which defendants made to plaintiffs, or any personal knowledge of defendants' representations on which plaintiffs relied. According to some district court cases, a party whose Rule 30(b)(6) deponent states that the party has no knowledge or position as to an area of inquiry cannot argue for a contrary position at trial, unless it can show that the information supporting its new position was not known or was inaccessible at the time of the 30(b)(6) deposition. *See Rainey v. American Forest & Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94–96 (D.D.C.1998); *United States v. Taylor,* 166 F.R.D. 356, 362–63 (M.D.N.C.1996). Assuming, for the sake of argument, that these cases correctly describe the effect of Rule 30(b)(6) deposition answers, Jensen's answers do not prevent plaintiffs from arguing that they were defrauded by defendants' alleged misrepresentations. The Court reads Jensen's 30(b)(6) deposition testimony as saying only that plaintiffs never received or relied upon any *direct* misrepresentations from Amoco.[13] As explained above, however, plaintiffs' case for fraud, deceit and deceptive trade practices revolves around alleged misrepresentations from defendants which they received and relied upon *indirectly,* through Banner and Rittershaus. Jensen's 30(b)(6) deposition does not preclude evidence of such a theory.

■ Finally, there is evidence to show that defendants' alleged misrepresentations caused plaintiffs' injuries. Under South Dakota law, a legal cause is a cause without which the alleged harm would not

---

**13.** Taken out of context, Jensen's 30(b)(6) deposition testimony might be read as referring to any representations or reliance by defendants, whether made directly or indirectly to plaintiffs. However, in the questions surrounding this testimony, defendants' attorney suggested that he was asking, not about representations which defendants made to Banner and Rittershaus, but rather about representations made directly to plaintiffs. (Jensen 30(b)(6) Dep. at 6:22–10:24; 11:23–12:10.) At one point, plaintiffs' attorney asked whether defendants were asking about reliance "other than through Rittershaus," but did not receive an answer from defense counsel. (Id.

at 7:14–19.) When read in this context, Jensen's testimony does not provide conclusive answers to whether plaintiffs ever indirectly received or relied upon any misrepresentations from defendants. If defendants had wanted conclusive answers, they could have propounded contention interrogatories which could have more clearly distinguished between theories of direct and indirect misrepresentation. *See United States v. Taylor,* 166 F.R.D. at 362 n. 7 ("Some inquiries are better answered through contention interrogatories wherein the client can have the assistance of the attorney in answering complicated questions involving legal issues.")

have occurred. In addition, for a legal cause to exist, the harm suffered must have been a foreseeable consequence of the act of which the plaintiff complains. *Musch v. H–D Coop., Inc.*, 487 N.W.2d 623, 624, 626 (S.D.1992) (approving a jury instruction which contained both of these requirements).[14] Defendants essentially argue that plaintiffs' injuries were not a foreseeable result of their representations about Techite pipe, because the alleged reliance those representations led only to Techite II's inclusion on Banner's list of acceptable materials, along with "eleven different pipe materials and sixteen different pipe suppliers," and did not obligate NCU to purchase Techite pipe. A jury, however, could reasonably conclude that defendants promoted Techite pipe to Rittershaus precisely because they foresaw the possibility Techite would be purchased for use in the Southwest Interceptor. NCU's decision to purchase Techite II may reasonably be seen as one step in a natural and probable sequence which began when defendants represented that Techite II met ASTM D 3262, which continued when Banner included Techite II in the specifications for the Southwest Interceptor, and which ended in damage to a majority of the pipeline and the need to replace all of the Techite II pipe in the interceptor. Thus, a reasonable jury could find that plaintiffs' injuries were a foreseeable consequence of defendants' representations about Techite II's ability to resist corrosion.[15]

## CONCLUSION

For the reasons stated, plaintiffs have not provided a sufficient basis to present to a jury their claims of strict products liability (Count I), negligence (Count II),

breach of express warranty (Count III) and breach of implied warranty of fitness for a particular purpose (Count IV). Plaintiffs have, however, presented sufficient evidence and a sufficient legal basis to support their claims of fraud, deceit and misrepresentation (Count V) and deceptive trade practices (Count VI). Accordingly,

IT IS ORDERED:

(1) that defendants' Motion for Summary Judgment on the Merits is granted in part and denied in part;

(2) that judgment is granted in favor of defendants and against plaintiffs on Counts I, II, III and IV of the Complaint;

(3) that judgment in favor of defendants on Counts V and VI of the Complaint is denied; and

(4) that the Motion for Reconsideration is denied.

---

**14.** A foreseeable consequence has been described as one which was "the natural and probable consequence" of the wrongful act, when viewed "in light of the attending circumstances." *Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 475–76, 4 Otto 469, 24 L.Ed. 256 (1876); *see also Prosser & Keeton on the Law of Torts*, § 43 at 282 (1984) (equating the phrase "natural and probable consequence" with the test of foreseeability).

**15.** Defendants do not argue that the chain of causation was broken by NCU's installation of the pipe with deflection above 5% but below 7.5%, conditions which were specifically approved by ARPCO prior to plaintiffs' acceptance of the Southwest Interceptor.